## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

JEREMY ALAN WILLIAMS,          )
                                         )
                Petitioner,        )
                                         )
v.                                         )        **Case No. 09-CV-0164-JHP-TLW**
                                         )
RANDALL WORKMAN, Warden,    )
Oklahoma State Penitentiary,      )
                                         )
                Respondent.      )

## OPINION AND ORDER

       This is a 28 U.S.C. § 2254 habeas corpus action. Petitioner, Jeremy Alan Williams, is an

Oklahoma death row prisoner. Williams appears through counsel, challenging his convictions and

sentences in Tulsa County District Court Case No. CF-2004-2805 (Dkt. # 28). Respondent filed a

response to the petition (Dkt. # 36), and Williams filed a reply (Dkt. # 46). The state court record

has been provided.[1] The Court considered all of these materials in reaching its decision. For the

reasons discussed below, the Court concludes the petition should be denied.

## BACKGROUND

**I.      Factual background**

       The relevant underlying facts of this case were set out in lengthy detail by the Oklahoma

Court of Criminal Appeals (OCCA) in addressing Williams' direct appeal. Williams v. Oklahoma,

188 P.3d 208, 214-17 (Okla. Crim. App. 2008). A short summary here provides background.

---

[1]      References to the trial transcript shall be referred to as "Tr. Trans. Vol. ___ at ___." The original state court record for Tulsa County District Court Case No. CF-2004-2805 shall be identified as "O.R. Vol. ___ at ___."

On June 22, 2004, around 9:15 a.m., two masked gunmen[2] entered the First Fidelity Bank at 2432 East 21st Street, Tulsa, Oklahoma. Tr. Trans. Vol. III at 625, 645, 801. The gunmen demanded money. During the course of the robbery three persons were shot. Bank president, Mark Poole, and bank customer, Howard Smith, were seriously wounded but recovered from their gunshot injuries. They both testified at Williams' trial. Bank teller, Amber Rogers, died as a result of gunshot wounds suffered during the robbery. Tr. Trans. Vol. VI at 1502.

Within twenty four hours the masked gunmen were identified as Alvin "Tony" Jordan and petitioner Williams. They were arrested, together with the driver of the getaway vehicle, Chris Jordan. Williams was charged with four counts: Count 1 - First Degree Murder, with alternative theories of malice murder or felony murder;[3] Count 2 - Robbery with Firearms; and Counts 3 and 4 - Shooting with Intent to Kill.[4] The State of Oklahoma filed a Bill of Particulars seeking the death penalty on Count 1, alleging three aggravating circumstances: (1) Williams created a great risk of death to more than one person; (2) the murder was committed for the purpose of avoiding arrest or

---

[2] One of the robbers was wearing a black, hooded sweat shirt, a stocking cap with eyeholes cut out, gloves and black shoes. He was carrying a silver revolver. The other robber was wearing a light colored, hooded sweat shirt, a similar stocking cap, and was carrying a black semi-automatic pistol. Evidence strongly indicated that Williams was the gunman wearing the black, hooded sweat shirt.

[3] Although the jury found Williams guilty under both theories, the OCCA construed the verdict as one of guilty of first degree malice murder. Williams, 188 P.3d at 225 (citing Alverson v. State, 1999 OK CR 21, ¶ 83, 983 P.2d 498, 521) (finding that in situations where the jury finds a defendant guilty of murder in the first degree under both principles of malice murder and felony murder, but using separate verdict forms, it will be construed as a first degree malice murder conviction).

[4] Williams was charged jointly with Alvin Jordan and Christopher Jordan in counts one and two, and jointly with Alvin Jordan in counts three and four.

prosecution; and (3) the existence of a probability that Williams will commit violent criminal acts that would constitute a continuing threat to society.

## II.     Procedural history

Williams' case was severed from his co-defendants for jury trial. He was represented at trial by attorneys Creekmore Wallace and Carla Root. His trial commenced on February 21, 2006, and concluded on March 6, 2006. The jury found Williams guilty of all four counts, and assessed punishment at fifteen years on Count 2, and life imprisonment on Counts 3 and 4. After finding the existence of two aggravating circumstances (great risk of death to more than one person and continuing threat), and determining the aggravating circumstances outweighed the mitigating circumstances, the jury recommended a sentence of death on Count 1. On March 20, 2006, the trial judge sentenced Williams in accordance with the jury's recommendations.

Represented by attorneys William H. Luker and Traci J. Quick from the Oklahoma Indigent Defense System (OIDS), Williams filed a direct appeal of his convictions and sentences to the OCCA in Case No. D-2006-338. He identified thirteen (13) propositions of error as follows:

Proposition 1:     The trial court committed reversible error by allowing the State to introduce evidence of Appellant's prior robbery of First Fidelity Bank, a prior crime which had nothing to do with the robbery on June 22, 2004, violating Appellant's rights under the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition 2:     The trial court committed reversible error by improperly denying Appellant's challenge for cause against several prospective jurors, thus compelling Appellant to use peremptory challenges against said jurors and resulting in the empaneling of objectionable jurors in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 9, 19, and 20 of the Oklahoma Constitution.

Proposition 3:    The trial judge violated Appellant's rights under the Fourth and Fourteenth Amendments of the United States Constitution, and Art. II, § 30 of the Oklahoma Constitution, when he allowed Officer Kennedy to testify about the fruits of an illegal search and seizure.

Proposition 4:    Reversible error was committed when the prosecutor questioned Dyra Malone about statements to the police on redirect examination when the subject matter of those statements had not been inquired about on cross-examination. The introduction of these statements violated Appellant's right to due process of law as established by the Fifth and Fourteenth Amendments of the United States Constitution and Article II, § 7 of the Oklahoma Constitution.

Proposition 5:    Admission of irrelevant but highly prejudicial evidence violated Appellant's due process rights under the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition 6:    The improper tactics and arguments of the prosecutor deprived Appellant of a fair trial and a reliable sentencing proceeding, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition 7:    The trial court erred in permitting irrelevant and unqualified expert or technical opinion testimony from Detective Jeff Felton. His opinion testimony invaded the province of the jury and denied Appellant a fair trial and the due process of law secured to him by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article II, §§ 7, 19, and 20 of the Oklahoma Constitution.

Proposition 8:    The State presented insufficient evidence to support Appellant's conviction for First Degree Malice Aforethought Murder, and accordingly imposing this conviction upon Appellant violates rights to due process of law and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

Proposition 9:    Mr. Williams' death sentence must be vacated because the use of victim impact evidence violated his rights under the Eighth and Fourteenth Amendments of the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution.

| Proposition 10: | Error in the jury instruction defining mitigation denied Mr. Williams' rights under the Eighth and Fourteenth Amendments to due process and a reliable sentencing proceeding. |
|---|---|
| Proposition 11: | The "continuing threat" aggravating circumstance is unconstitutional both on its face and as applied by this court, thereby rendering Mr. Williams' death sentence invalid in contravention of the Eighth and Fourteenth Amendments to the United States Constitution as well as Article II, §§ 2, 9 of the Oklahoma Constitution. |
| Proposition 12: | Appellant received ineffective assistance of counsel, in violation of the Sixth, Eighth, and Fourteenth Amendments of the United States Constitution and Article II, §§ 7, 9, and 20 of the Oklahoma Constitution. |
| Proposition 13: | The accumulation of error in this case deprived Mr. Williams of due process of law, and a reliable sentencing proceeding in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article II, §§ 7 and 9 of the Oklahoma Constitution. |

See Brief of Appellant filed March 19, 2007 in OCCA Case No. D-2006-338.

On June 25, 2008, the OCCA affirmed the conviction and sentence for first degree murder. Williams, 188 P.3d at 232. Williams filed a petition for rehearing on July 15, 2008, which was denied on July 24, 2008. Dkt. # 28 at 8. He also filed a petition for certiorari before the United States Supreme Court in Case No. 08-7973. The petition was denied on March 2, 2009. Williams v. Oklahoma, 129 S.Ct. 1529 (2009).

Williams' first application for post-conviction relief was filed on May 1, 2008, together with an application for an evidentiary hearing and request to conduct discovery, in OCCA Case No. PCD-2006-1012. Represented by OIDS attorneys Wyndi Thomas Hobbs and Kelsie Buntin, he presented the following three (3) grounds for relief:

| Proposition I: | Trial and appellate counsel rendered ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments and the Oklahoma Constitution by failing to adequately investigate, develop and present mitigating evidence on behalf of Mr. Williams. |
|---|---|

|                 |                                                                                                                                                                                                                                    |
| --------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
| Proposition II: | Trial counsel were ineffective for failing to attempt to rehabilitate potential jurors who expressed doubt at their ability to give a death sentence.                                                                               |
| Proposition III: | The cumulative impact of errors identified on direct appeal and post-conviction proceedings rendered the trial resulting in the death sentence arbitrary, capricious, and unreliable. The death sentence in this case constitutes cruel and unusual punishment and a denial of due process of law. |

See Original Application for Post-Conviction Relief in OCCA Case No. PCD-2006-1012. All requested relief was denied on January 13, 2009, in an unpublished opinion. See Order Denying Petitioner's Original Application for Post-Conviction Relief and Denying Petitioner's Application for Discovery and for an Evidentiary Hearing.  Dkt. # 28, Ex. 12.

On September 10, 2009, after he initiated this habeas corpus proceeding but before his petition was filed, Williams filed a second application for post-conviction relief and request for an evidentiary hearing in OCCA Case No. PCD-2009-803. Represented by attorneys John E. Dowdell and Ryan A. Ray, he raised the following three (3) propositions of error:

|                 |                                                                                                                                                                                                                                    |
| --------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
| Proposition I:  | Mr. Williams' trial and appellate counsel were ineffective in violation of the Sixth, Eighth, and Fourteenth Amendments and the Oklahoma Constitution by failing to argue that the death sentence imposed on Williams failed to comply with the Sixth Amendment right to jury trial. |
| Proposition II: | Mr. Williams' trial counsel was ineffective for failure to object to other-crimes evidence, prosecutorial misconduct, and improper opinion testimony. Newly discovered evidence tending to prove the reasons for these failures mandates an evidentiary hearing and reconsideration of this Court's previous denial of these ineffective assistance of counsel claims. |
| Proposition III: | Should this Court determine that the newly discovered evidence regarding ineffective assistance of counsel should have been discovered through the exercise of reasonable diligence, Mr. Williams' appellate counsel was ineffective in failing to discover the evidence and failing to raise the issue in Mr. Williams' direct appeal. |

See Second Application for Post-Conviction Relief, OCCA Case No. PCD-2009-803. The OCCA

denied Williams' request for relief in an unpublished opinion filed November 12, 2009. See Opinion

Denying Petitioner's Subsequent Application for Post-Conviction Relief and Denying Petitioner's

Motion for Appointment of an Expert and Motion for Discovery and an Evidentiary Hearing in

OCCA Case No. PCD-2009-803. Dkt. # 28, Ex. 14.

Williams initiated this federal habeas action on March 24, 2009, by filing an application to

proceed *in forma pauperis* (Dkt. # 1), and a request for appointment of counsel (Dkt. # 2). His

petition, filed on March 2, 2010, identifies the following thirteen (13) grounds for relief:

> Ground One: Mr. Williams's trial and appellate counsel rendered ineffective assistance of counsel in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution by failing to adequately investigate, develop and present reasonably available mitigating evidence on behalf of Mr. Williams as required by *Wiggins v. Smith*, 539 U.S. 510 (2003) and similar authorities.

> Ground Two: Findings predicate to imposition of the death sentence upon Mr. Williams, who was not the actual killer of the homicide victim, were not made by the jury in violation of the Sixth Amendment to the United States Constitution as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and their progeny, and trial and appellate counsel were ineffective for failing to raise this clearly established legal error.

> Ground Three: There was insufficient evidence to convict Mr. Williams of first-degree malice-aforethought murder, and the Oklahoma Court of Criminal Appeals' adoption of , and retroactive application of, a new definition of first-degree malice-aforethought murder violated Mr. Williams's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

> Ground Four: The conduct of Mr. Williams's trial counsel during the first stage of trial was constitutionally ineffective in contravention of the Sixth and Fourteenth Amendments to the United States Constitution, as Mr. Williams's lead trial counsel failed to object to numerous pieces of patently inadmissible evidence and improper argument, and may have

7

been constructively absent during trial, due to his impairment from drug abuse.

Ground Five: The improper tactics and arguments of the prosecutors deprived Mr. Williams of a fair trial and a reliable sentencing proceeding, in violation of Eighth and Fourteenth Amendments to the United States Constitution.

Ground Six: Mr. Williams's death sentence was imposed in violation of the Eighth and Fourteenth Amendments to the United States Constitution where venire members were excluded in contravention of *Witherspoon v. Illinois*, 391 U.S. 510 (1968) merely because of general objections to the death penalty, and Mr. Williams's trial counsel was ineffective in violation of the Sixth Amendment for failing to attempt rehabilitation of these venire members.

Ground Seven: Mr. Williams's death sentence was imposed in violation of the Eighth and Fourteenth Amendments to the United States Constitution because venire members were empaneled despite expressing views that would prevent or substantially impair the performance of a juror's duties in accordance with the Court's instructions and the juror's oath in contravention of *Wainwright v. Witt*, 469 U.S. 412 (1985).

Ground Eight: Mr. Williams's rights under the Eighth Amendment to the United States Constitution were violated by the unduly prejudicial victim-impact statements introduced during the sentencing phase of trial, and by the trial court's failure to instruct the jury on the permitted use of those statements.

Ground Nine: Admission of irrelevant but highly prejudicial evidence violated Mr. Williams's rights under the Eighth and Fourteenth Amendments to the United States Constitution.

Ground Ten: The jury instruction given in the sentencing phase of Mr. Williams's trial regarding the jury's consideration of mitigating evidence precluded the jury from considering all aspects of Mr. Williams's character or record and all circumstances surrounding the offenses at issue in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

Ground Eleven: The "continuing threat" aggravating factor is unconstitutionally vague - in violation of the Eighth and Fourteenth Amendments to the United States Constitution - as applied to Mr. Williams.

<table>
<tr><td>Ground Twelve:</td><td>Mr. Williams's right to effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution was violated as a result of the cumulative prejudice arising from counsel's multiple deficient acts and omissions.</td></tr>
<tr><td>Ground Thirteen:</td><td>Mr. Williams's right to a fair trial and a reliable sentencing proceeding as guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution was violated as a result of the cumulative prejudice arising from the admission of multiple pieces of inadmissible evidence and multiple acts of prosecutorial misconduct.</td></tr>
</table>

See Dkt. # 28.

## GENERAL CONSIDERATIONS

### I. Exhaustion

Generally, federal habeas corpus relief is not available to a state prisoner unless all state court remedies have been exhausted prior to the filing of the petition. 28 U.S.C. § 2254(b)(1)(A); Harris v. Champion, 15 F.3d 1538, 1554 (10th Cir. 1994); see also Wainwright v. Sykes, 433 U.S. 72, 80-81 (1977) (reviewing history of exhaustion requirement). In every habeas case, the Court must first consider exhaustion. Harris, 15 F.3d at 1554. "States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." Coleman v. Thompson, 501 U.S. 722, 731 (1991) (explaining that the exhaustion requirement is "grounded in principles of comity"). The exhaustion doctrine "is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." Rose v. Lundy, 455 U.S. 509, 518 (1982).

In most cases, a habeas petition containing both exhausted and unexhausted claims is deemed a mixed petition requiring dismissal. Id. at 522. Where it is clear, however, that a procedural bar would be applied by the state courts if the claim were now presented, the reviewing habeas court can

examine the claim under a procedural bar analysis instead of requiring exhaustion.[5] Coleman, 501

U.S. at 735 n.1 (citations omitted). Also, the Court has the discretion to ignore the exhaustion

requirement altogether and deny the petition on the merits if the claim lacks merit. Fairchild v.

Workman, 579 F.3d 1134, 1156 (10th Cir. 2009) (listing options available to the district court faced

with a mixed petition); 28 U.S.C. § 2254(b)(2). Respondent contends that some of Williams' claims

are unexhausted. Therefore, the Court will address the threshold question of exhaustion as it arises

in each ground.

## II.     Procedural Bar

The Supreme Court has considered the effect of state procedural default on federal habeas

review, giving strong deference to the important interests served by state procedural rules. See, e.g.,

Francis v. Henderson, 425 U.S. 536 (1976). Habeas relief may be denied if a state disposed of an

issue on an adequate and independent state procedural ground. Coleman, 501 U.S. at 750; Medlock

v. Ward, 200 F.3d 1314, 1323 (10th Cir. 2000). A state court's finding of procedural default is

deemed "independent" if it is separate and distinct from federal law. Ake v. Oklahoma, 470 U.S.

68, 75 (1985); Duvall v. Reynolds, 139 F.3d 768, 796-97 (10th Cir. 1998).  If the state court finding

is "strictly or regularly followed" and applied "evenhandedly to all similar claims," it will be

considered "adequate."  Maes v. Thomas, 46 F.3d 979, 986 (10th Cir. 1995) (citing Hathorn v.

Lovorn, 457 U.S. 255, 263 (1982)).

---

[5]      A claim raised for the first time in federal habeas proceedings may be subject to an
"anticipatory procedural bar" if the claim is technically unexhausted, but any attempt to
present it to Oklahoma state courts would result in a procedural bar ruling under state law.
See Anderson v. Sirmons, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007).

To overcome a procedural default, a habeas petitioner must demonstrate either: (1) good cause for failure to follow the rule of procedure and actual resulting prejudice; or (2) that a fundamental miscarriage of justice would occur if the merits of the claims were not addressed in the federal habeas proceeding. Coleman, 501 U.S. at 749-50; Sykes, 433 U.S. at 91. The "cause" standard requires Williams to "show that some objective factor external to the defense impeded . . . efforts to comply with the state procedural rules." Murray v. Carrier, 477 U.S. 478, 488 (1986). Examples of such external factors include the discovery of new evidence, a change in the law, or interference by state officials. Id. He must also show "'actual prejudice' resulting from the errors of which he complains." United States v. Frady, 456 U.S. 152, 168 (1982). Alternatively, the "fundamental miscarriage of justice" exception requires a petitioner to demonstrate that he is "actually innocent" of the crime of which he was convicted. McCleskey v. Zant, 499 U.S. 467, 495 (1991). He must make "a colorable showing of factual innocence" to utilize this exception. Beavers v. Saffle, 216 F.3d 918, 923 (10th Cir. 2000). It is intended for those rare situations "where the State has convicted the wrong person of the crime. . . . [Or where] it is evident that the law has made a mistake." Klein v. Neal, 45 F.3d 1395, 1400 (10th Cir. 1995).

## III.    Antiterrorism and Effective Death Penalty Act of 1996

This Court's review is governed by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to each claim depends upon how that claim was resolved by the state courts. Alverson v. Workman, 595 F.3d 1142, 1146 (10th Cir. 2010) (citing Snow, 474 F.3d at 696). When a state court has adjudicated the merits of a claim, a petitioner may obtain federal habeas relief only if the state decision "was contrary to, or involved an unreasonable application of, clearly

established[6] Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1) or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254 (d)(2). See also Williams v. Taylor, 529 U.S. 362, 402 (2000); Neill v. Gibson, 278 F.3d 1044, 1050-51 (10th Cir. 2001).

The first step in applying § 2254(d)(1) standards is to assess whether there was clearly established federal law at the time the conviction became final, as set forth in the holdings of the Supreme Court. House v. Hatch, 527 F.3d 1010, 1016-17 (10th Cir. 2008). Without clearly established federal law, this Court need not assess whether the state court's decision was "contrary to" or involved an "unreasonable application" of such law. Id. at 1018. If clearly established federal law exists, the Court must then consider whether the state court decision was contrary to or involved an unreasonable application of Supreme Court law. Id. When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. See Bell v. Cone, 535 U.S. 685, 699 (2002); Hooper v. Mullin, 314 F.3d 1162, 1169 (10th Cir. 2002). An "unreasonable application of federal law is different from an incorrect application of federal law." Williams, 529 U.S. at 410. "This distinction creates 'a substantially higher threshold' for obtaining relief than de novo review.'" Renico v. Lett, 130 S.Ct. 1855, 1862 (2010) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).

It is not necessary, however, that the state court cite to controlling Supreme Court precedent, so long as neither the reasoning nor the result of the state court decision contradicts Supreme Court

---

[6] A legal principle is "clearly established" within the meaning of this provision only when it is embodied in a holding of the Supreme Court. See Carey v. Musladin, 549 U.S. 70, 74 (2006) (instructing that "clearly established" must be narrowly construed).

law. Early v. Packer, 537 U.S. 3, 8 (2002). Further, the Supreme Court has recently held that "review under §2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011). Thus, "evidence introduced in federal court has no bearing on §2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of §2254(d)(1) on the record that was before that state court." Id. at 1400 (footnote omitted).

Application of § 2254(d)(2) requires the Court to review any factual findings of the state court to ascertain whether they were unreasonable in light of the evidence presented at trial. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 130 S.Ct. 841, 849 (2010) (citing Williams, 529 U.S. at 410). The "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Williams' habeas proceedings in the instant matter commenced well after the effective date of AEDPA. Therefore, to the extent Williams' claims are cognizable in this federal habeas corpus proceeding and not procedurally barred, those claims shall be reviewed pursuant to § 2254(d). See McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003).

**GROUNDS FOR RELIEF**

**I.      Ineffective assistance of counsel (grounds 1 and 4)**

Claims of ineffective assistance of counsel are mixed questions of law and fact. Bland v. Sirmons, 459 F.3d 999, 1030 (10th Cir. 2006); Wallace v. Ward, 191 F.3d 1235, 1247 (10th Cir. 1999) (applying AEDPA). It is well settled that to prevail on an ineffective assistance of counsel claim, a habeas petitioner must satisfy the two-pronged standard established by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984). See Murray v. Carrier, 477 U.S. 478, 488-89 (1986); United States v. Cook, 45 F.3d 388, 394-95 (10th Cir. 1995). The Strickland test requires a showing of both deficient performance by counsel and prejudice to the petitioner as a result of the deficient performance. Strickland, 466 U.S. at 687.

Deficient performance is established by showing counsel committed serious errors in light of "prevailing professional norms" to the extent that the legal representation fell below "an objective standard of reasonableness." Strickland, 466 U.S. at 688.[7] To satisfy the deficient performance prong of the test, a petitioner must overcome a strong presumption that counsel's conduct fell within the "wide range of reasonable professional assistance [that] . . . might be considered sound trial strategy." Brecheen v. Reynolds, 41 F.3d 1343, 1365 (10th Cir. 1994) (citations omitted). Finally, the focus of the first prong is "not what is prudent or appropriate, but only what is constitutionally compelled." Id. "For counsel's performance to be constitutionally ineffective, it must have been 'completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy.'" Le v. Mullin, 311 F.3d 1001, 1025 (10th Cir. 2002) (citing Hoxsie v. Kerby, 108 F.3d

---

[7]     The Strickland Court declined to form a checklist for evaluation of attorney performance or to define exhaustively the obligations for counsel, saying: "More specific guidelines are not appropriate. The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance. . .The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688.

1239, 1246 (10th Cir. 1997) (quoting <u>Hatch v. Oklahoma</u>, 58 F.3d 1447, 1459 (10th Cir. 1995), *overruled on other grounds by* <u>Daniels v. United States</u>, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001))).

Even if Williams is able to show constitutionally deficient performance, he must also show prejudice under <u>Strickland's</u> second prong before a reviewing court will rule in favor of an ineffective assistance of counsel claim. "Prejudice" in this context means that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 687. Stated differently, Williams must prove that "there is a 'reasonable probability' that the outcome would have been different had those errors not occurred." <u>United States v. Haddock</u>, 12 F.3d 950, 955 (10th Cir. 1993) (citing <u>Strickland</u>, 466 U.S. at 694). When a petitioner is specifically challenging the imposition of the death sentence during the punishment phase of the trial, the prejudice prong of <u>Strickland</u> focuses on whether there is "a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." <u>Bland v. Sirmons</u>, 459 F.3d 999, 1030 (10th Cir. 2006); <u>Strickland</u>, 466 U.S. at 695.

Courts may address the performance and prejudice components in any order and need not address both if a defendant fails to make a sufficient showing of one. <u>See</u> <u>Strickland</u>, 466 U.S. at 697. Failure to establish either prong of the <u>Strickland</u> standard will result in a denial of petitioner's Sixth Amendment claim. <u>Id</u>. The <u>Strickland</u> test qualifies as "clearly established Federal law, as determined by the Supreme Court" under AEDPA, and must be applied in reviewing an ineffective-assistance claim. <u>See</u> <u>Williams v. Taylor</u>, 529 U.S. 362, 363 (2000).

Finally, a claim of ineffective assistance "must be reviewed from the perspective of counsel at the time." <u>Duvall v. Reynolds</u>, 139 F.3d 768, 777 (10th Cir. 1998) (quoting <u>Porter v. Singletary</u>,

14 F.3d 554, 558 (11th Cir. 1994)).  Every effort must be made by a reviewing court to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  Strickland, 466 U.S. at 689.

### Ground One

In ground one, Williams asserts that his trial counsel was constitutionally ineffective for failing to investigate adequately  and present his case for mitigation during second stage proceedings.

He raised a similar claim to the OCCA as part of proposition one in his first application for post-conviction relief. Proposition one included the following specific allegations of ineffective assistance of counsel: (1) trial counsel did not seek funding to employ a mitigation specialist; (2) trial counsel was paid inadequate funds;[8] and (3) trial and appellate counsel failed to investigate and present evidence and witness statements "showing extensive mitigating evidence in Williams' life."[9] See Original Application for Post-Conviction Relief in OCCA Case No. PCD-2006-1012. Citing Strickland, the OCCA denied relief, finding:

> Williams claims that trial counsel was ineffective for failing to fulfill the duty of effective counsel in developing a case in mitigation and that direct appeal counsel was ineffective for [failing to raise] raising [sic] this claim on appeal. He first claims that counsel failed to seek the assistance of a mitigation specialist. Williams cites to Guideline 4.1 of the *ABA Guidelines for the Appointment and Performance of Defense in Death Penalty Cases* (Feb. 2003), which states that the defense should have at least two qualified attorneys, an investigator, and a mitigation specialist. Absent in Williams' claim is any concrete evidence indicating that additional

---

[8]     Williams did not include a claim in this habeas petition regarding inadequate payments to counsel.

[9]     To support this claim, Williams provided the OCCA with affidavits from Dale Williams, David Williams, Jeffery Williams, Jerel Williams, Joey Williams, Floyd Williams, Jason Williams, Joy Thomas, and Joni Williams.

mitigation evidence would have been discovered had a mitigation specialist been utilized.

While Williams argues, later in this proposition, that counsel failed to utilize available mitigation witnesses, the witnesses identified were all relatives of Williams, and he cannot say that they would have been utilized had a mitigation specialist been employed; thus, this aspect of his claim must be denied.
. . . .

Williams argues next that available mitigation witnesses were not utilized at trial. The witnesses were all relatives of Williams: six uncles, an aunt and his maternal grandfather. The aunt and uncles were siblings to Joni Williams, Jeremy Williams' mother. Joni Williams testified during the second stage of trial as a mitigation witness, along with Dr. Wanda Draper, Ph.D. an expert and specialist in the "child development" field of study, as well as a mitigation witness.

Williams has provided affidavits from these "unused" mitigation witnesses. All of these witnesses explain their relationship to Williams, their own recollection of Williams' childhood, and the overall family life. Five of the six uncles are convicted felons; they all describe the family environment in which Jeremy Williams was raised as one where violent fights were common and where drugs were sold out of the home. According to Williams, these uncles were his only role models.

Joni Williams, who did testify, told the same story. Her testimony at trial summed up the environment in which Jeremy Williams was raised: Jeremy was born to a single teenage mother, with no contact with his biological father. Joni let her mother raise Jeremy until Jeremy was eight or nine years old. At that time, Jeremy's grandmother died. Jeremy moved in with Joni and her husband, both of whom had formed no emotional bond with Jeremy.

Joni testified that her brothers had felony convictions and she and her husband counseled Jeremy to stay away from them, as she believed they were a bad influence on Jeremy's life. She explained that it was struggle to keep Jeremy away from the bad influence of her brothers and keep Jeremy in school and out of trouble.

Dr. Draper outlined Jeremy's life starting with his premature birth to an emotionally detached, teen mother, who abandoned him, and allowed his grandmother to become the primary caretaker in a home filled with criminal activity. Draper knew about the uncles. She testified that she talked with several of the uncles, so for their affidavits to state that they were not contacted before trial is simply misleading. These uncles were Jeremy's male role models and father figures. Draper's testimony reveals that these role models were a negative influence on Jeremy's life, and the aunt was not much better.

It is no wonder that trial counsel decided to exclude the other family members from testifying during the sentencing stage of this trial with these two witnesses testifying that Jeremy's family surroundings were filled with these negative role models. Counsel knew about these witnesses, knew their background, and could predict their testimony.[4] We find that his decision not to use these witnesses (aunt, uncle and grandfather) was made after a reasonable investigation into mitigation evidence. *See Wiggins v. Smith,* 539 U.S. 510, 521-22, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003). We further find that this decision amounted to reasonable trial strategy, thus counsel was not ineffective for failing to utilize these relatives as mitigation witnesses.

> [4] Counsel would have reasonably predicted that these witnesses would have testified they believed that Jeremy was a good kid, and they would have asked the jury to spare his life.

See Dkt. # 28, Ex. 12. Respondent contends ground one is unexhausted and subject to an anticipatory procedural bar because the claim he presents to this Court is substantially different from the one presented to the OCCA on post-conviction. See Dkt. # 36 at 13-19. Williams replies that his claim is exhausted, was decided on the merits by the OCCA, but the state court's decision was an unreasonable application of Supreme Court law. Dkt. # 46 at 47-72. To resolve the exhaustion issue, the Court has carefully reviewed the allegations made in proposition one of the post-conviction application and ground one of the instant case.

Relying heavily on affidavits from second stage expert, Wanda Draper, Ph.D., and Williams' family members, Williams' ground one habeas claim presented to this Court addresses the following alleged constitutional deficiencies in counsels' representation: (1) his attorneys did not accompany Dr. Draper during her interviews of Williams and of his family members; (2) counsel did not obtain key records; (3) counsel did not facilitate "critical" interviews with the defense investigator or Williams' family members, other than a group family interview; (4) counsel did not communicate sufficiently with Dr. Draper and did not prepare Dr. Draper for her testimony; (5) counsel did not engage the services of a trained mitigation specialist; (6) counsel did not contact or interview several

witnesses including Dale Williams, David Williams, Jeff Williams, Jerel Williams, and Joey Williams; (7) several witnesses who were contacted were not asked to testify, including Floyd Williams, Jason Williams, Joy Thomas, and Terry Williams; and (8) other persons could have provided testimony about Williams' background but were not contacted, including Larry Ingraham (pastor), David Shane (cousin), DeMonte Daniels (childhood friend), Chris Clemons (childhood friend), Glenda Sylbie (teacher), Debra Brown (teacher), Jennifer Thompson (aunt), Shameisha Smith (friend), Tracy Williams (uncle), Tony Williams (uncle), Moline Norman (great-aunt), Irthoudis Green (great-aunt), and Carolyn Ingraham (church member). Williams alleges that the jury was limited to the "scant" mitigation testimony of Dr. Draper and Joni Williams, and was never given the opportunity to understand Williams' background and experiences. He also claims his appellate counsel was ineffective for failing to raise this claim on direct appeal.

Insofar as Williams' ground one complains of counsels' dealings with Dr. Draper, the Court agrees with Respondent that this portion of his ground one claim was never presented to the OCCA and is unexhausted. In his reply, Williams argues that the "efficacy of Dr. Draper's function" was specifically raised in his post-conviction application, referring the Court to a footnote in the application. See Dkt. # 46 at 47. The footnote, however, was part of Williams' post-conviction claim that trial counsel did not employ a mitigation specialist, and simply stated that Dr. Draper's role was to evaluate Mr. Williams developmentally and serve as a social historian, not as a mitigation specialist. Nowhere in the application for post-conviction relief does Williams detail counsels' alleged shortcomings with regard to Dr. Draper as they are described in his habeas petition and in Dr. Draper's affidavit attached to the petition. Accordingly, the Court concludes that the portion of his ground one claim specifically referencing counsels' interactions and alleged failures with regard

to Dr. Draper is unexhausted and subject to an anticipatory procedural bar. Because Oklahoma would bar consideration of this precise claim on an independent and adequate state law procedural ground if Williams presented it in a third post-conviction application, the claim is barred for purposes of federal habeas review in the absence of a showing of cause and prejudice. Clayton v. Gibson, 199 F.3d 1162, 1174 (10th Cir. 1999); see also Moore v. Reynolds, 153 F.3d 1086, 1097 (10th Cir. 1998) (finding that Oklahoma's procedural rule barring claims brought in a second application for post-conviction relief that could have been and were not raised in a previous application is adequate to bar habeas review of ineffective assistance of counsel claims). Williams does not present cause and prejudice or fundamental miscarriage of justice arguments to overcome a procedural bar. Instead, he confidently argues in his reply that the claims relating to Dr. Draper were simply an extension of the ineffectiveness claim raised on post-conviction, and have been exhausted. Consequently, after reviewing the proposition one issue raised on post-conviction and the ground one claim raised in this habeas proceeding, the Court concludes that Williams' failure to present to the state court the factual basis of his ineffective assistance of counsel claim, insofar as it relates to Dr. Draper, precludes habeas review of this portion of his ground one claim.

The remaining portions of ground one were addressed on the merits by the OCCA in its opinion denying Williams' first application for post-conviction relief. Thus, the Court now turns to the application of the Strickland standard to the facts of Williams' case, and to the reasonableness of the OCCA's findings on post-conviction. The Court need not address the deficiency prong of the Strickland standard because the Court finds that Williams' ground one claim fails to demonstrate prejudice resulting from the deficiencies alleged in his claim. In assessing prejudice under Strickland, the prejudice prong is satisfied if "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. Williams carries the burden of demonstrating that his trial attorneys' alleged deficient investigation and presentation of mitigation evidence prejudiced his defense. Upon review of the record and the mitigation evidence now presented by Petitioner's current counsel, this Court concludes that the requisite showing of prejudice has not been made. See Knighton v. Mullin 293 F.3d 1165,1178 (10th Cir. 2002).

In making this determination, the Court has considered "the strength of the State's case and the number of aggravating factors the jury found to exist, as well as the mitigating evidence the defense did offer and any additional mitigating evidence it could have offered." Id. (citing Neill v. Gibson, 278 F.3d 1044, 1062 (10th Cir. 2001)). In Williams' trial, the State's case was strong. The jury found that Williams was one of the two armed robbers who participated in the robbery of First Fidelity Bank and the shooting of three victims, including the murder of bank teller, Amber Rogers. Substantial evidence supported this finding, as summarized by the OCCA:

> At around 9:15 a.m. Sandra Simmons, who was outside in the parking lot, saw a white sports car that reminded her of a Camaro or Firebird leaving the parking lot. This car had damage to the right front fender. She could not see inside the car because it had dark tinted windows. This car, as well as several other pieces of evidence presented by the State, proved that Williams was involved in the robbery, and that he was possibly the gunman wearing the black-hooded sweatshirt. This evidence included (1) Williams' confession to witness Beverly Jordan that he shot some people and that they divided the money; (2) Williams' possession of a large sum of cash after the bank robbery; (3) Williams' admitted ownership of the firearms used in the robbery; (4) Williams' statement to Dyra Malone that he "jacked" a white man; (5) Williams' DNA found on a dark blue stocking cap used in the robbery; (6) a shoe print at the scene that matched the black shoes Williams was wearing when arrested; and (6) [sic] Williams' admission that he robbed the same bank a few weeks earlier and had transacted business at the bank before that.

Williams, 188 P.3d at 214-15 (footnote omitted).

The jury further found the existence of two aggravating factors as to the murder conviction: (1) the defendant knowingly created a great risk of death to more than one person; and (2) the existence of a probability that Williams would commit criminal acts of violence that would constitute a continuing threat to society. The OCCA left standing the jury's conclusions.

The defense offered two mitigation witnesses: Dr. Wanda Draper, and Joni Williams, the petitioner's mother. As detailed in Williams' petition, see Dkt. # 28 at 62-63, both witnesses described Williams' childhood history and problems he faced while growing up. See also Order Denying Petitioner's Original Application for Post-Conviction Relief, OCCA Case No. PCD-2006-1012 (Dkt. # 28, Ex. 12).

Finally, the Court has examined the mitigating evidence Williams claims should have been presented. He argues that had his attorneys conducted an adequate investigation for second stage evidence, they would have discovered many helpful witnesses who could have persuaded the jury to spare Williams' life. Dkt. # 28 at 125-27. Petitioner presents affidavits to show the nature and extent of available mitigation evidence. He contends that, if presented during second stage, testimony from the following witnesses would have altered the jury's decision to impose the death penalty.

Krill Gromov - According to his affidavit, Krill Gromov served as an investigator for Williams' counsel. He stated that his assignments dealt primarily with issues in the first stage. This affidavit is the same one presented to the OCCA on post-conviction and deals primarily with the low amount he was paid for his services. Dkt. # 28, Ex. 2.

Floyd Williams - This affiant is Williams' grandfather. If asked to testify he would explain how Williams' got his nickname "Worm" because he looked so tiny when born prematurely. He would have also told the jury that he loved Williams and asked them not "to kill him." Dkt. # 28, Ex. 3.

Jason Williams - One of Petitioner's uncles, Jason Williams, stated in his affidavit that he would have been willing to testify and ask the jury to spare Williams' life. He would have

told how Williams got his nickname, and how some of Williams' uncles sold drugs from the family home. He always thought of Petitioner "as a good kid." Dkt. # 28, Ex. 4.

Joni Williams - Petitioner's mother, Joni Williams, provided details about Petitioner's early years. She claims he "is a good person and a very loyal friend and son" and "doesn't deserve to die." Dkt. # 28, Ex. 5.

Joy Thomas - According to the affidavit of Petitioner's aunt, Joy Thomas, she would have testified about Williams' early days when he came home from the hospital, and his relationship with his mother and his grandmother. She also states that she warned Williams "about hanging out" with Alvin Jordan. Further, she believed that Petitioner's girlfriend, Dyra, placed a lot of pressure on him, was very high maintenance, and "wanted him to buy her stuff all the time." Dkt. # 28, Ex. 6.

Joey Williams - According to his affidavit, Joey Williams was another of Petitioner's uncles who would have testified about Petitioner's childhood. He remembered wrestling in the home with his brothers (Petitioner's uncles) and Petitioner. Sometimes Petitioner would cry and tell his mother and grandmother that the uncles were being too mean. Joey acknowledges that he and his brothers were not good role models for Petitioner. He says drugs were sold in front of Petitioner and they also smoked weed in front of him. Joey admits that he was a gang member and Petitioner "was exposed to some gang violence and gang banging." He says he would have begged the jury not to kill Petitioner, that he loved him, and that Petitioner always made him smile and happy. He says he told Petitioner that "Alvin [Jordan] was a bad influence and he looked wet, high on PCP, all the time." He states that he was incarcerated for awhile on H unit "where Death Row is located" and that it was a crazy environment. Dkt. # 28, Ex. 7.

David Williams - Another of Petitioner's uncles, David Williams, stated that Petitioner was living in the house when the police came to pick David up - he was "resistant and drunk." If asked to testify he would have told the jury that Petitioner made some mistakes but "he's basically a good kid." He would have asked them not to kill him. He would also have told the jury that serving time in the prison system is not an easy time. Dkt. # 28, Ex. 8.

Dale Williams - Another of Petitioner's uncles, Dale Williams, states in his affidavit that he remembered Petitioner having the run of the house while growing up in the family home. He states that he and his brothers were "running around with some questionable people" and it is likely that Petitioner "saw one or more of us selling drugs and hustling." He says there was lots of violence in the neighborhood. He admits that he was incarcerated and he would have told the jury that giving Petitioner "life or life without parole would not be letting him off the hook." Finally he says, if asked to testify, he would have told the jury that he loved Petitioner, misses talking to him, seeing him and playing basketball with him - that Petitioner has a good heart and soul. Dkt. # 28, Ex. 9.

Jeffery Williams - Another of Petitioner's uncles, Jeffery Williams, states in his affidavit that he believes Petitioner was impressed by his uncles and that they led him astray. Petitioner was young and would mimic the violent fights that the uncles had with each other and would try to fight like them with his cousins. He admits that they were not good role models. He says he would ask the jury "not to kill" Petitioner. He also states that he would have told the jury about the violence in prison, how you always have to be on guard, can't trust anyone, and you are truly alone. Dkt. # 28, Ex. 10.

Jerel Williams - According to the affidavit of another of Petitioner's uncles, Jerel Williams, he would have testified that Petitioner was little and looked up to all his uncles. He describes the fighting that Petitioner observed and admits they could have been better role models. He would have told the jury that Petitioner was "a level kid," that he was outgoing, finished school and would be willing to work. He also says that he knew Alvin Jordan but didn't trust him because he would steal his "stuff." If given the chance, he would tell the jury that serving time is not easy and he would ask the jury not to kill Petitioner. Dkt. # 28, Ex. 11.

Mary Wanda Draper, Ph.D. - Dr. Draper, a developmental specialist, performed a study of Petitioner's family and personal background. She testified at trial but explains in her affidavit that she was not provided the assistance and guidance from counsel that she normally received when hired as a defense expert. Dkt. # 28, Ex. 1.

Upon careful review of the mitigation evidence that Petitioner's current counsel contends should have been discovered and presented, the Court cannot reasonably conclude that the additional evidence would have made a difference in the sentencing. See Schriro v. Landrigan, 550 U.S.465, 480 (2007). Although the mitigation evidence, if discovered and presented, may have provided some additional insight into his upbringing and his family relationships, much of it was cumulative. This Court finds that there is not a reasonable probability that the introduction of the proffered additional witness testimony would have caused the jury to decline to impose the death penalty.

Nor does the failure of trial counsel to discover and present this evidence undermine the Court's confidence in the jury's determination of his death sentence. The State presented three aggravating circumstances: (1) Mr. Williams knowingly created a great risk of death to more than one person; (2) the murder was committed to avoid arrest or prosecution; and (3) the existence of a probability that Mr. Williams would commit criminal acts of violence that would constitute a

continuing threat to society. The jury did not find that the murder was committed to avoid arrest. The testimony of the witnesses Petitioner claims should have testified during second stage primarily focuses on the family history of Mr. Williams. The fact that the additional witnesses considered Mr. Williams a "good kid" whose life should be spared would not have altered the evidence which supported the continuing threat aggravator. Nor would the testimony have negated or affected in any way the fact that Mr. Williams knowingly created a great risk of death to more than one person. Finally, the opinions offered by Dr. Draper do not convince the Court that the jury would have spared Williams the death penalty had she been allowed to conduct additional interviews and testify in more detail about Williams' family history and its effect on his behavior. Accordingly, any failure of trial counsel to investigate and present the mitigating evidence described by Williams did not constitute prejudice under <u>Strickland</u>. The OCCA's denial of relief on this claim was not contrary to, or an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. §2254(d). Habeas relief is denied as to ground one.

*Ground four*

Williams' next claim of ineffective assistance of counsel is found in ground four. In this ground he alleges his trial attorney, Creekmore Wallace, failed to object to inadmissible evidence, improper opinion testimony, and improper argument by the prosecutor. He also asserts that Mr. Wallace's failures were due to his own impairment from alcohol and/or drug abuse. He seeks an evidentiary hearing on this issue. Respondent acknowledges that the ground four issues have been exhausted, but contends that the OCCA's findings are not contrary to, or an unreasonable application of Supreme Court law.

Williams begins by identifying several instances during trial when counsel failed to preserve the record on appeal by making contemporaneous objections to inadmissable items of evidence, and to improper tactics and arguments by the prosecutor. This part of ground four was rejected by the OCCA on direct appeal, as more particularly explained below:

Other-crimes evidence - Williams complains that "several pieces of evidence" were entered without objection from counsel. However, the only item he discusses is a watch containing Williams' DNA, collected from the top of a refrigerator in his girlfriend's apartment. The questions regarding the watch indicated that it was stolen, but counsel did not object to the questions. The OCCA found that the watch "was relevant to corroborate Clark's testimony that Williams had been in her apartment." Williams, 188 P.3d at 220.

Re-direct examination of Dyra Malone - Williams contends that the prosecution's redirect examination exceeded the scope of cross-examination. Attorney Wallace did not object. The OCCA found that the redirect "did not exceed the scope of cross-examination as it was relevant to show whether or not Dyra Malone was a credible witness and was in direct response to defense counsel's cross-examination." Id. at 222.

Photographs of Tarina Clark's apartment - Williams claims that the admission of these photos prejudiced him by inviting impermissible inferences about his lifestyle and the persons with whom he associated. He also claims they were irrelevant. The OCCA found that the photographs were "relevant for the jury to understand Tarina Clark's testimony." Further, "Williams and his compatriots were at this apartment the night before the robbery." Id. at 223.

Photographs of murder victim's nude body - He argues that the two photographs should not have been admitted as they were inflammatory and served only to evoke the passions and sympathy of the jury. Counsel's failure to object was exacerbated when the prosecution referred to the photographs during closing argument and said the images will be etched in everybody's mind. The OCCA found that the photographs show the entry and exit of the gunshot wounds suffered by Amber Rogers and were relevant because they "more closely depict the nature and extent of the gunshot wound on the victim's body than any other evidence available, including the medical examiner's depiction of the wound locations on a chart." Id.

Dr. Yeary's testimony - Dr. Yeary was Amber Rogers' treating physician after the shooting. Williams asserts that counsel should have objected to the unfairly prejudicial extent of the testimony when Dr. Yeary testified "to virtually every aspect of her treatment in detail" which served only to evoke passion and sympathy. Dkt. # 28 at 163. The OCCA found no plain error because the "State had to show that Amber Rogers died despite the heroic efforts of the surgery team." Williams, 188 P.3d at 224.

Surgeons' testimony regarding treatment of surviving victims - Williams complains that his attorney did not object to second stage testimony from Dr. Atherton and Dr. Fisher regarding their treatment of the injuries suffered by Mark Poole and Howard Smith. He claims their testimony was irrelevant to the aggravating circumstances, was unfairly prejudicial, and was introduced only to inflame the passions of the jury. Dkt. # 28 at 164. On direct appeal, the OCCA concluded that there was no plain error because their testimony about the nature and extent of gunshot wounds to the surviving victims was relevant to the "great risk of death to more than one person" aggravating circumstance. Williams, 188 P.3d at 224.

Officer Felton's testimony - Williams claims that Officer Felton gave improper opinion testimony about abrasions and bruises he had observed on Petitioner at the time he was arrested. The OCCA concluded that it was error to allow this opinion testimony, but the error did not rise to the level of plain error because it did not go to the foundation of the case or take from Williams a right essential to his defense. Id. at 225.

Prosecutorial misconduct - Williams asserts that counsel's failure to object to "numerous instances" of misconduct by the prosecutors resulted in a violation of his constitutional right to effective assistance of counsel. The OCCA denied relief finding that defense counsel's failure to object did not rise to the level of ineffective assistance under the Strickland standard. Id. at 231.

The OCCA's denial of relief on each of the above ineffective assistance of counsel claims raised by Williams on direct appeal was properly based on Strickland standards. In each instance, the OCCA determined that counsel's performance was not deficient or, if an error was committed, there was no prejudice to Williams.[10] This Court agrees. Williams has not demonstrated that his counsel was constitutionally ineffective for the failures alleged. There is no such thing as a perfect trial. Moore v. Reynolds, 153 F.3d 1086, 1117 (10th Cir. 1998) (noting that appellate courts afford attorneys a great deal of leeway in how they litigate cases when reviewing claims of ineffective

---

[10] Although not specifically addressed by the OCCA, Williams also claims that his trial counsel was ineffective for failing to prepare adequately for Officer Kennedy's testimony, and for failing to note a critical change in witness Beverly Jordan's testimony. See Dkt. # 28 at 168. Upon de novo review of these claims, the Court finds that the alleged failures of trial counsel did not rise to the level of a constitutional violation. Le v. Mullin, 311 F.3d 1002, 1011 n.2 (10th Cir. 2002) (citing Duckett v. Mullin, 306 F.3d 982, 990 n.1 (10th Cir. 2002) (finding de novo review necessary to review federal claim where state court did not address merits)).

assistance of counsel). None of the alleged failures of Williams' trial counsel enumerated in ground four rises to the level of a constitutional violation.

Williams re-urged his ineffective assistance of counsel claims in a second application for post-conviction relief, citing "recently discovered new evidence" tending to prove the reasons for attorney Creekmore Wallace's alleged failures. The new evidence consisted of an email from Mr. Wallace posted on a criminal defense lawyers' LISTSERV. In the email dated March 23, 2006, Mr. Wallace warns of the personal toll a defense lawyer suffers when representing death row clients. Williams points specifically to Mr. Wallace's reference to an alcohol problem, and to the line in the email which states, "I pop Valium like candy just to face the day." Williams presents the same argument in his habeas petition. See Dkt. # 28 at 169-72 and Ex. 15.

In its order denying relief on Williams' second application for post-conviction relief, the OCCA found as follows:

> He next claims that counsel was ineffective for failing to object to a litany of alleged trial errors at trial. He proffers an explanation for trial counsel's failure which will not be discussed in this opinion. We discussed trial counsel's failure to object during Williams' direct appeal and found that these failures did not amount to ineffective assistance, *Williams*, 2008 OK CR 19, ¶¶ 126-36, 188 P.3d at 230-32. Williams raises no new failures in this proposition, only the proffered explanation, not amounting to reasonable trial strategy, for the failures previously raised in earlier appeals.
>
> Regardless of the reasons for the failures to object, whether it be strategy, mistake, oversight or some unexplainable reason, this Court found on direct appeal and in the original application for post-conviction relief that counsel did not act outside the wide range of reasonable professional conduct nor did Williams suffer the kind of prejudice, that deprived him of a fair trial with a reliable result, thus counsel's conduct was not ineffective under the *Strickland* standard. Because this issue has been decided in Williams' previous appeals, this claim is barred and has no merit.

See Dkt. # 28, Ex. 14 at 4-5. The OCCA also found no basis for an evidentiary hearing, and denied that request. Id. at 5.

In ground four, Williams argues that "upon information and belief" trial attorney Creekmore Wallace "was under the influence of Valium and alcohol during the Williams trial." Dkt. # 28 at 170. He concludes that there is a reasonable probability that Mr. Wallace's "impairment tainted the entire trial proceedings, undermining their reliability, and denying Mr. Williams his Sixth Amendment right to effective assistance of reasonably competent counsel." Id. Citing United States v. Cronic, 466 U.S. 648 (1984), Williams argues that his counsel may have been constructively absent due to his substance abuse problems, rendering him unable to provide effective assistance of counsel. Dkt. # 28 at 181. He urges the Court to conduct an evidentiary hearing on this issue.

Williams' allegations of substance abuse by attorney Creekmore Wallace are based solely on an email sent by Mr. Wallace approximately three weeks after the Williams trial concluded. Emphasizing the line in the email where Mr. Wallace states he pops Valium like candy, Williams completely ignores the very next sentence in the email which reads, "I can only lay off the Valium and alcohol **during trial**." Dkt. # 28, Ex. 15 (emphasis added). Instead, "upon information and belief" Williams argues to this Court that counsel was abusing alcohol and/or Valium during his trial. Williams has provided no evidence - absent his assertions - that Mr. Wallace was using or abusing alcohol and/or Valium during his trial. Further, agreeing with the OCCA's findings on second post-conviction, it is not necessary to delve further into Williams' allegations of substance abuse by his counsel because the Court has not found that Mr. Wallace provided constitutionally ineffective assistance on the many claims raised by Williams. Habeas corpus relief is denied on this claim. Further, an evidentiary hearing is not necessary on any of the ground four issues, including Williams' claim of substance abuse by his counsel.

## II.     Ring/Apprendi violation (ground 2)

In his second ground for relief, Williams argues that his death sentence violates the constitutional standards set forth in Ring v. Arizona, 536 U.S. 584 (2002) (holding that Arizona statute which allowed a trial judge, sitting alone, to determine the presence or absence of aggravating factors in a capital case violated the Sixth Amendment right to a jury trial), and Apprendi v. New Jersey, 530 U.S. 466 (2000) (finding it "unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed."). He claims that the OCCA, rather than the jury, made certain factual findings required by Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S. 137 (1987). Specifically, he argues that the jury did not make the findings of fact required by Enmund and Tison to make him eligible for the death penalty. Instead, those findings were made by the OCCA on direct appeal, in violation of the mandates set forth in Ring and Apprendi.

This claim was first presented to the OCCA in Williams' second application for post-conviction relief. The OCCA found the issue procedurally barred because it could have been raised on direct appeal or in Williams' first application for post-conviction relief. Dkt. # 28, Ex. 14. Respondent contends that this issue is procedurally barred.

*Procedural Bar*

Williams seeks to excuse the procedural bar by claiming his trial and appellate counsel were ineffective for failing to raise the claim earlier. However, in this instance, not only was the issue not raised at trial or on direct appeal, but it was not presented to the OCCA in Williams' first application for post-conviction relief. Ineffective assistance of post-conviction counsel is insufficient to establish cause and prejudice because a criminal defendant is not constitutionally entitled to representation by counsel in state post-conviction proceedings. Cummings v. Sirmons, 506 F.3d 1211, 1223 (10th

Cir. 2007) (citing <u>Fleming v. Evans</u>, 481 F.3d 1249, 1255 (10th Cir. 2007)). Clearly, this issue could have been raised in Williams' first post-conviction application in state court. Thus, the Court concludes that Williams' failure to raise his <u>Ring/Apprendi/Enmund/Tison</u> claim until his second application for post-conviction relief precludes federal habeas corpus review of the claim. The OCCA's finding rested on a state procedural ground independent of the federal question, and was an adequate basis for dismissing the claim. <u>See</u> <u>Moore v. Reynolds</u>, 153 F.3d 1086, 1097 (10th Cir. 1998).

*Alternate analysis of merits*

Although Williams acknowledges that he did not specifically raise his <u>Ring/Apprendi</u> claim until his second post-conviction proceeding, he argues alternatively that the OCCA ruled on the issue *sua sponte* in its direct appeal opinion when it found as follows:

> Due to Williams' arguments in proposition eight [in which Williams claimed there was insufficient evidence to prove that he was guilty of first degree malice murder because he did not fire the fatal shot and did not intend for the shooter to kill Amber Rogers], we find it necessary, out of an abundance of caution, to state that Williams is eligible for the death penalty because he aided and abetted in first degree malice murder. [FN23]

> > [FN23] Even if Williams had only been convicted of felony murder, he would still be eligible to receive the death penalty because he was a major participant in this crime, and he exhibited a reckless indifference to human life, even to the point of shooting victims with intent to kill. *See Tison v. Arizona*, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed. 2d 1140 (1982). In *Tison*, a felony-murder case in which the defendant himself did not kill, the Supreme Court held that a defendant who did not actually commit the act which caused death, but who was a major participant in the felony and who had displayed reckless indifference to human life, may be sufficiently culpable to receive the death penalty. 481 U.S. at 158, 107 S.Ct. at 1688. *Tison* modified the Supreme Court's holding in *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), finding that the Eighth Amendment forbids the imposition of the death penalty on

> "one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." <u>Id.</u>, 458 U.S. at 797, 102 S.Ct. at 3376.

<u>Williams</u>, 188 P.3d at 232. Williams claims that the OCCA's findings do not comport with the <u>Apprendi/Ring</u> Sixth Amendment rulings which require a jury to make the requisite findings under <u>Enmund/Tison</u> before imposing the death penalty on an individual who was not the actual killer.

"The central concern of the <u>Enmund/Tison</u> line of Supreme Court cases is whether a conviction for <u>felony murder</u> contains an adequate determination of defendants' culpability such that imposition of the death penalty does not violate the Eighth Amendment's prohibition against cruel and unusual punishment." <u>Workman v. Mullin</u>, 342 F.3d 1100, 1110-11 (10th Cir. 2003) (emphasis added). In <u>Enmund</u>, the defendant was convicted of felony murder (the unlawful killing occurring during the perpetration of or in the attempted perpetration of robbery). The sole issue decided by the Court was whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life. <u>Enmund</u>, 458 U.S. at 787. Enmund was the driver of the getaway car for two others who killed an elderly man and his wife. The United States Supreme Court found that the imposition of the death penalty where "the record supported no more than the inference that Enmund was the person in the car by the side of the road at the time of the killings, waiting to help the robbers escape" was inconsistent with the Eighth and Fourteenth Amendments. <u>Id.</u> Unlike the facts in <u>Enmund</u>, the evidence in Petitioner's trial indicated he participated fully in the armed robbery of the bank. Therefore, this Court finds the facts of this case evidencing Petitioner's participation in the murder are clearly distinguishable from <u>Enmund</u>.

Similarly, in <u>Tison</u>, the defendants were convicted of felony murder. Again, there was no evidence the Tison brothers took any act intended to kill. The issue, therefore, became whether the

Eighth Amendment prohibited a death sentence where the defendants' participation, combined with a reckless indifference to human life, was sufficient to satisfy the culpability requirements of Enmund. Unlike Enmund, the defendants' personal involvement in Tison was described by the Supreme Court as substantial. The Court held that:

> [T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

Tison, 481 U.S. at 157-58. As in Tison, Williams was actively involved in the felony of armed robbery and was physically present during the entire sequence of criminal activity culminating in the shooting of two victims, the killing of Amber Rogers, and the subsequent flight by Williams and his co-defendants. Contrary to Williams' belief, the law does not absolve him of liability for first degree murder simply because he may not have been the person who actually shot the weapon which killed Amber Rogers. It is clear to this Court that the Enmund/Tison culpability requirement was satisfied.

Further, the Court notes that even though the jury found Williams guilty of first degree murder under both theories - malice murder and felony murder - the OCCA construed the verdict on appeal as one of first degree malice murder pursuant to its previous ruling in Alverson v. State, 983 P.2d 498, 521 (Okla. Crim. App. 1999). Williams, 188 P.3d at 225. The OCCA's decision to construe the verdict as one of first degree malice murder provides additional support for this Court's conclusion that Williams' Enmund/Tison claim must fail. It is not necessary in a malice aforethought analysis to require the jury to reexamine its first-stage finding of guilt, which included a specific finding of malice as required in the jury instructions. See e.g., Cannon v. Gilson, 259 F.3d 1253,

1279 n.24 (10th Cir. 2001) (finding Cannon's <u>Enmund/Tison</u> claim should fail because the jury, after being properly instructed, found him guilty of malice aforethought murder).

Finally, concerning Williams' argument that the jury did not make the necessary findings of fact to justify eligibility for the death penalty, the Court notes that the jury was instructed at the conclusion of first stage evidence that, "no person may be convicted of murder in the first degree unless his conduct caused the death of the person allegedly killed. A death is caused by the conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life." Instruction No. 23, O.R. Vol. VI at 1043. They were further instructed that "malice aforethought" means the deliberate intent to take a human life. <u>Id.</u> at 1044, Instruction No. 24. In Instruction No. 26 the jurors were advised that, "The external circumstances surrounding the commission of a homicidal act may be considered in finding whether or not deliberate intent existed in the mind of the defendant to take a human life. External circumstances include words, conduct, demeanor, motive, and all other circumstances connected with a homicidal act." <u>Id.</u> at 1046. Finally, Instruction No. 35 addressed the role of the parties in the murder: "All persons concerned in the commission of a crime are regarded by the law as principles and are equally guilty thereof. A person concerned in the commission of a crime as a principal is one who directly and actively commits the act(s) constituting the offense or knowingly and with criminal intent aids and abets in the commission of the offense or whether present or not, advises and encourages the commission of the offense." <u>Id.</u> at 1056. This instruction was explained further, as follows:

> Merely standing by, even if standing by with knowledge concerning the commission of a crime, does not make a person a principal to a crime. Mere presence at the scene of a crime, without participation, does not make a person a principal to a crime.

> One who does not actively commit the offense, but who aids, promotes, or encourages the commission of a crime by another person, either by act or counsel or both, is deemed to be a principal to the crime if he knowingly did what he did either with criminal intent or with knowledge of the other person's intent. To aid or abet another in the commission of a crime implies a consciousness of guilt in instigating, encouraging, promoting, or aiding in the commission of that criminal offense.

Id. at 1057, Instruction No. 36. The jury returned a verdict of guilty of malice aforethought murder in the first degree and first degree felony murder. Id. at 1011. Because a jury is "presumed to follow its instructions," Weeks v. Angelone, 528 U.S. 225, 234 (2000), when they marked guilty on the verdict form, they necessarily had to have found that Williams was a principal and had the requisite intent for murder. It was not necessary for them to revisit the issue of intent in the second stage proceedings. The Tenth Circuit has found:

> [U]nder Oklahoma law, in order to return a verdict of guilty, the jury is required to find, beyond a reasonable doubt, each element of the offense charged. In the sentencing phase of a capital case, the jury is required to find, beyond a reasonable doubt, the existence of the aggravating circumstances alleged and whether the aggravating circumstances outweigh the mitigating evidence. This is the basis upon which the death sentence is imposed, not any findings as to culpability which might be required by Enmund/Tison.

Gilson v. Sirmons, 520 F.3d 1196, 1219-1220 (10th Cir. 2008).

The Court concludes that Williams' alternative argument that the OCCA wrongly decided his claim on the merits, in violation of Enmund/Tison and Ring/Apprendi, must fail. To the extent the OCCA addressed this claim *sua sponte* on direct appeal, the decision was not an unreasonable application of Supreme Court law. Williams has not demonstrated that he is entitled to habeas relief on his ground two claim.

## III.    Insufficient evidence (ground 3)

Williams argues in ground three that there was insufficient evidence to convict him of first degree malice aforethought murder because there was no evidence that he killed Amber Rogers,

directed Alvin Jordan to shoot Amber Rogers, or that he had told Jordan to shoot Ms. Rogers before the robbery. Dkt. # 28 at 154. He contends the evidence was insufficient to prove that he aided and abetted in the murder of Ms. Rogers. This claim was presented as part of Proposition VIII on direct appeal. In denying relief, the OCCA found as follows:

In *Powell v. State*, 2000 OK CR 5, ¶ 48, 995 P.2d 510, 524, this Court stated that the test for aiding and abetting was as follows:

> All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, are principals and are equally culpable with other principles. *Rounds v. State,* 679 P.2d 283, 286–87 (Okl. Cr.1984); 21 O.S.1991, § 172. Mere presence or acquiescence, without participation, does not constitute a crime. However, only slight participation is needed to change a person's status from a mere spectator into an aider and abettor. *Hackney v. State*, 874 P.2d 810, 814 (Okl. Cr.1994); *McBrain v. State*, 763 P.2d 121, 124–125 (Okl. Cr.1988). "Aiding and abetting in a crime requires the State to show the accused procured it to be done, or aids, assists, abets, advises or encourages the commission of the crime." *Hindman v. State*, 647 P.2d 456, 458 (Okl. Cr.1982).

In our analysis of the sufficiency of the evidence, we view the evidence in a light most favorable to the State to determine whether any rational trier of fact could have found the elements of the offense beyond a reasonable doubt. *See Easlick v. State*, 2004 OK CR 21, ¶ 15, 90 P.3d 556, 559. This test is appropriate here where there was both direct evidence and circumstantial evidence supporting the conviction. *See Spuehler v. State*, 1985 OK CR 132, ¶ 7, 709 P.2d 202, 203–04. An analysis of the facts shows that the evidence was more than sufficient to support the conviction for malice murder.

In this case, the State presented evidence that Williams had the idea of robbing this bank because he had successfully robbed it before. Williams admitted that his guns were used in the robbery. Under the State's theory, the first person shot was customer Smith, whom Williams shot in the back, with the intent to kill. Then Williams shot Poole in the side, again with intent to kill.

The State attempted to argue that Williams fired at Amber Rogers as he was leaving, but the evidence really did not support that theory. It appears that Williams fired three shots. According to the State, he shot Smith twice (once in the back and

once in the forehead) and shot Poole once. Three empty cartridges and three live rounds were found in Williams' revolver.

It is clear that he intended to kill at the bank. It is also clear that he knew that his codefendant was armed with a loaded weapon and both of them had spoken of killing, "if they had to," in preparation for this robbery. If he had intended to kill when he shot, how could he not know that his codefendant also shot with intent to kill? These two defendants acted with one accord and the evidence shows that they shot each person with intent to kill.

There was sufficient evidence presented to prove beyond a reasonable doubt that Williams is guilty of malice murder.

Williams , 188 P.3d at 226. The OCCA also noted in a footnote that it was overruling certain language in another case which dealt with the intent required of an aider and abettor, stating:

According to Appellant's brief, we must determine whether the evidence was sufficient to show that either Williams shot and intended to kill Amber Rogers, or Williams aided and abetted the Rogers' killer with a personal intent to kill or he aided and abetted with full knowledge of the intent of the killer. *See Johnson v. State*, 1996 OK CR 36, ¶ 20 928 P.2d 309, 315. We overrule the language in *Johnson* which indicates this is the proper test and we continue to abide by the general aiding and abetting language. *See Banks v. State*, 2002 OK CR 9, ¶ 13, 43 P.3d 390, 397 ("Aiding and abetting in a crime requires the State to show that the accused procured the crime to be done, or aided, assisted, abetted, advised or encouraged the commission of the crime.") We note that Appellant would even lose this proposition under the *Johnson* test, because his involvement was such that he personally had the intent to kill or knew that his codefendant had the intent to kill, when Amber Rogers was shot.

Id. at 225 n.18.

The question before the Court is limited to deciding whether the OCCA's conclusion constituted an unreasonable application of Supreme Court law. 28 U.S.C. § 2254 (d)(1). In examining Williams' sufficiency of the evidence claim, the appropriate inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original) . The Court must view evidence in the "light most

favorable to the prosecution," id., and "accept the jury's resolution of the evidence as long as it is within the bounds of reason." Grubbs v. Hannigan, 982 F.2d 1483, 1487 (10th Cir. 1993). This standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. The Tenth Circuit has emphasized that, under Jackson, review is "sharply limited" and a court "faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Messer v. Roberts, 74 F.3d 1009, 1013 (10th Cir. 1996) (quoting Wright v. West, 505 U.S. 277, 296-97 (1992)). Here, the Court must consider whether the OCCA's decision that there was sufficient evidence to support a jury's finding of first degree malice aforethought murder was contrary to or an unreasonable application of Jackson. 28 U.S.C. § 2254(d)(1); Spears v. Mullin, 343 F.3d 1215, 1238 (10th Cir. 2003).

In applying the Jackson standard, the Court looks to Oklahoma law to determine the substantive elements of the relevant criminal offense. Jackson, 443 U.S. at 324 n.16. Under Oklahoma law, first degree murder is defined as unlawfully killing another person with malice aforethought. Okla. Stat. tit. 21, § 701.7. "Premeditated design sufficient to establish malice aforethought may be inferred from the fact of killing alone, unless the facts and circumstances raise a reasonable doubt as to whether such design existed." Hancock v. State, 155 P.3d 796, 812 (Okla. Crim. App. 2007). Further, those who aid and abet the commission of a murder are designated as principals and may be convicted as such. Okla. Stat. tit. 21, § 172 (providing that persons "concerned in the commission of crime, . . . whether they directly commit the act constituting the

offense, or aid and abet in its commission, . . . are principals"). Williams argues that at the time of his conviction the law in Oklahoma required that to convict an aider or abettor of first degree murder, the prosecution must prove "(1) that the defendant personally intended the death of the victim; and (2) that the defendant aided and abetted with full knowledge of the perpetrator's intent . . . ." See Wingfield v. Massie, 122 F.3d 1329, 1332 (10th Cir. 1997) (citing Johnson v. State, 928 P.2d 309, 315 (Okla. Crim. App. 1996, *overruled* by Williams, 188 P.3d at 225 n.18)). Additionally, the OCCA has "elaborated on the range of conduct for which a conviction for aiding and abetting may be sustained, stating that aiding and abetting involves "'acts, words, or gestures encouraging the commission of the offense, either before or at the time of the offense.'" Wingfield, 122 F.3d at 1332 (quoting VanWoundenberg v. State, 720 P.2d 328, 333 (Okla. Crim. App. 1986)).

Williams argues that he lacked the requisite intent because he had no idea that Alvin Jordan was going to kill Amber Rogers. The OCCA ruled otherwise, noting that it is clear that Williams intended to kill at the bank and the evidence shows that both Williams and Alvin Jordan shot each person with the intent to kill. Williams, 188 P.3d at 226. The facts support the OCCA's conclusion. His involvement was far more extensive than that of an unwitting bystander. Williams admitted that he had successfully robbed this same bank before. He admitted that his guns were used in the robbery. He fired three shots himself (twice at Howard Smith and once at Mark Poole). Testimony revealed that Williams and Jordan had spoken of killing "if they had to" in preparation for the robbery. Based upon these facts not in dispute, a rational trier of fact could have inferred subjective intent from Williams' acts and found proof beyond a reasonable doubt that he intended the death of Ms. Rogers and knew of Alvin Jordan's intent. "Even when a defendant, as here, denies having the requisite intent, a jury may disbelieve the defendant if his words and acts in light of all the

circumstances make his explanation seem improbable." <u>Wingfield</u>, 122 F.3d at 1333 (citation omitted). After viewing the evidence as a whole, and in the light most favorable to the prosecution, this Court finds that a rational jury could have found that Williams intended the death of Amber Rogers, and thus, that he was guilty of aiding and abetting Alvin Jordan in the murder of Ms. Rogers. The OCCA's rejection of Williams' claim of insufficient evidence was not contrary to, or an unreasonable application of, clearly established Supreme Court law, nor was it based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)(2).

Williams also challenges the OCCA's decision to overrule its previous definition of aiding and abetting found in <u>Johnson</u>. In <u>Williams</u>, the OCCA concluded that the proper test in Oklahoma for aiding and abetting is found in <u>Banks v. State</u>, 43 P.3d 390, 397 (Okla. Crim. App. 2002). <u>See</u> <u>Williams</u>, 188 P.3d at 226 n.18. Citing <u>Rogers v. Tennessee</u>, 532 U.S.451, 461 (2001), Williams now argues that the OCCA's decision to "change" its definition of aiding and abetting created a new type of malice aforethought murder, and was the constitutional equivalent of an *ex post facto* law and a due process violation. Dkt. # 28 at 156. Respondent contends that this portion of Williams' ground three claim is unexhausted and should be procedurally barred.

Regardless of the exhaustion status of this claim, the Court finds it lacks merit and shall be denied. 28U.S.C. § 2254(b)(2). First, a state court may interpret its own laws. See <u>Garner v. Louisiana</u>, 368 U.S. 157, 166 (1961); see also <u>Willingham</u>, 296 F.3d 923. Further, the OCCA specifically found that the evidence was sufficient to prove first degree malice murder under the aider and abettor definition found in either <u>Banks</u> or <u>Johnson</u>. <u>See</u> <u>Williams</u>, 188 P.3d at 225 n.18 ("We note that Appellant would even lose this proposition under the <u>Johnson</u> test, because his

involvement was such that he personally had the intent to kill or knew that his codefendant had the intent to kill, when Amber Rogers was shot."). This Court concludes that the OCCA's decision did not constitute a violation of Williams' due process rights. Habeas relief is denied on his ground three claim.

## IV.     Prosecutorial misconduct (ground 5)

In Williams' ground five claim, he asserts that the improper tactics and arguments of the prosecutors deprived him of a fair trial and a reliable sentencing proceeding, in violation of the Eighth and Fourteenth Amendments to the United States Constitution. More specifically, he complains that: (1) during first-stage closing arguments, the prosecutor expressed his personal opinion that Williams was guilty; (2) the prosecutors argued facts not in evidence; (3) the prosecutors unnecessarily ridiculed Williams; (4) during second stage closing arguments, the prosecutor improperly sought to evoke sympathy for the victim; (5) the prosecutor expressed his personal opinion to the jury that Williams deserved the death penalty; and (6) the prosecutor elicited improper opinion testimony from a witness. These allegations were raised on direct appeal and rejected by the OCCA. Williams, 188 P.3d at 228-30. Respondent contends that the OCCA's holding is not contrary to, or an unreasonable application of, clearly established Supreme Court law.

The Supreme Court has established rules that govern a petitioner's prosecutorial misconduct claims. "Generally, a prosecutor's improper remarks require reversal of a state conviction only if the remarks 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Le v. Mullin, 311 F.3d 1002, 1013 (l0th Cir. 2002) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). "Alternatively, if the alleged prosecutorial misconduct denied the petitioner a specific constitutional right (rather that the general due process right to a fair trial), a

valid habeas corpus claim may be established without proof that the entire trial was rendered fundamentally unfair. Id.

To determine whether a trial is rendered fundamentally unfair, the court examines the entire proceeding, "including the strength of the evidence against the petitioner . . . as well as [a]ny cautionary steps-such as instructions to the jury-offered by the court to counteract improper remarks." Bland v. Sirmons, 459 F.3d 999, 1024 (10th Cir. 2006) (alteration in original) (internal quotation marks omitted). "'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned.'" Id. (alteration in original) (quoting Darden v. Wainwright, 477 U.S. 168, 181 (1986)). "The ultimate question is whether the jury was able to fairly judge the evidence in light of the prosecutors' conduct." Id. All but one of Williams' complaints of prosecutorial misconduct can be analyzed under the Donnelly fundamental fairness test.

*Prosecutor's comments regarding Williams' guilt*

Williams first complains that, during first stage closing arguments, the prosecutor stated that "what is true" is that Williams is guilty beyond a reasonable doubt under both theories of first degree murder - malice aforethought and felony murder. He claims that the statements concerning guilt "are nothing more than the prosecutor's personal belief" and are prohibited by the Constitution. In rejecting this claim, the OCCA found as follows:

> In proposition six, Williams claims that the prosecutor committed misconduct during several phases of the trial, especially during closing arguments. He first claims that the prosecutor expressed his personal opinion of guilt during the first stage closing argument, because he failed to preface part of his argument with phrases such as "the evidence showed." Williams failed to lodge an objection to these comments;      therefore, we review for plain error only.

During the last portion of the second closing argument, the prosecutor stated, "[Y]our verdict is to speak the truth. What's true is this defendant is guilty of murder . . . . They're guilty. He's guilty. And he's guilty beyond a reasonable doubt."

Any prosecutor is usually going to tell the jury what he thinks the evidence showed. If his argument is reasonably based on the evidence, there should be no error. Here, the prosecutor is not telling the jury to abandon its duty and convict based on the prosecutor's own opinion. He is simply telling them that the evidence supported a guilty verdict. *See Banks*, 2002 OK CR 9, ¶ 43, 43 P.3d at 402. This argument did not constitute error.

Williams, 188 P.3d at 228. The Tenth Circuit Court of Appeals has found "no practical distinction" between the formulations of plain error used by the OCCA and the federal due process test, requiring reversal when an error "so infused the trial with unfairness as to deny due process of law." Thornburg v. Mullin, 422 F.3d 1113, 1125 (10th Cir. 2005) (quoting Estelle v. McGuire, 502 U.S. 62, 75 (1991)). As noted by the OCCA, although the prosecutor's comments may suggest that he was impermissibly expressing his personal opinion, in context, they were "simply an assertion to the jury that the evidence supported a verdict of guilt." Banks v. State, 43 P.3d 390, 402 (Okla. Crim. App. 2002). This Court agrees that Williams' trial was not rendered fundamentally unfair by the prosecutor's comments concerning Williams' guilt.

Williams makes a further argument in his reply that the relevant standard for reviewing the alleged opinion statements of the prosecutor is not the Donnelly fundamental fairness test because the prosecutor's statements violated his specific constitutional right to a presumption of innocence. When a prosecutor's comment or argument deprives a petitioner of a specific constitutional right, "a habeas claim may be established without requiring proof that the entire trial was thereby rendered fundamentally unfair." Mahorney v. Wallman, 917 F.2d 469, 472 (10th Cir. 1990) (distinguishing, in the context of prosecutorial misconduct, claims based on the deprivation of a specific

constitutional right from claims based on generalized due process concerns (citing <u>Donnelly</u>, 416 U.S. at 643)). However, not every improper and unfair remark made by a prosecutor will amount to a federal constitutional deprivation. <u>See</u> <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 338 (1985) (plurality opinion). In the case at hand, Petitioner claims that the prosecutor's improper remarks in first stage closing that Williams was guilty violated his specific constitutional right to the presumption of innocence.[11] The proper standard under which a specific constitutional claim should be analyzed, therefore, is whether the specific "constitutional guarantee was so prejudiced that it effectively amounted to a denial of that right." <u>Torres v. Mullin</u>, 317 F.3d 1145, 1158 (10th Cir. 2003) (citing <u>Paxton v. Ward</u>, 199 F.3d 1197, 1217-18 (10th Cir. 1999)). Although Williams' petition does not clearly state a claim based on the presumption of innocence, out of an abundance of caution, this Court will determine whether the prosecutor's comments were so prejudicial that they effectively denied Williams his constitutional guarantee of a presumption of innocence. <u>See</u> <u>Torres</u>, 317 F.3d at 1158; <u>Mahorney</u>, 917 F.2d at 472 (concluding that petitioner's rights were effectively denied because the "essence of the error in the prosecution's comments . . . was that they conveyed to the jury the idea that the presumption had been eliminated from the case prior to deliberations").

---

[11]    The Supreme Court has acknowledged that certain unarticulated rights are implicit in enumerated constitutional guarantees. "For example, . . . the right to be presumed innocent . . . appear[s] nowhere in the Constitution or Bill of Rights." <u>Richmond Newspapers, Inc. v. Virginia</u>, 448 U.S. 555, 579-80 (1980). However, this unarticulated right has "nonetheless been found to share constitutional protection in common with explicit guarantees." <u>Id.</u> at 580. "While use of the particular phrase 'presumption of innocence' - or any other form of words - may not be constitutionally mandated, the Due Process Clause of the Fourteenth Amendment must be held to safeguard 'against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.'" <u>Taylor v. Kentucky</u>, 436 U.S. 478, 485-86 (1978) (quoting <u>Estelle v. Williams</u>, 425 U.S. 501, 503 (1976)).

Upon examination of the record in this case, the Court finds that the OCCA's rejection of this claim because the prosecutor's comments "did not constitute error" was not contrary to or an unreasonable application of clearly established federal law. 28 U.S.C. § 2254(d). The Court finds that the prosecutor's comments did not imply that the presumption of innocence no longer existed. The prosecutor was not telling the jury to abandon its duty. Mahorney requires the Court to "evaluate the prejudicial effect that the objectionable comments had on the presumption of innocence by considering the pertinent surrounding circumstances at trial." Mahorney, 917 F.2d at 473. The jury was specifically instructed that what the attorneys said in closing argument was purely argument and not evidence to be considered in reaching their verdict. This Court finds that the presumption of innocence was not so prejudiced by the prosecutor's comments the comments effectively amounted to a denial of the presumption. See Torres, 317 F.3d at 1158. Williams is not entitled to habeas relief on this portion of his ground five claim.

*Facts not in evidence*

Williams next contends that the prosecutors presented facts to the jury which were not in evidence. More specifically, he complains of: (1) the prosecutor's questions about a stolen watch during Williams' cross-examination; (2) first stage closing argument comments about robbing the bank; (3) the prosecutor's repeated use of the words "we know" about matters that were not in evidence; (4) the prosecutor's remarks about the murder victim being caught in cross-fire; and (5) second stage closing argument statements about Williams buying the ammunition used in the robbery and supplying the getaway car.

The OCCA rejected this claim, finding as follows:

Next, Williams complains that the prosecutor presented facts not in evidence during both stages of trial. His first claim revolves around the cross examination of Williams, when the prosecutor asked if he knew the watch, bearing his DNA, was stolen. There was no objection to this line of questioning. He argues that this questioning presented facts not in evidence and presented other crimes evidence. The questioning did not present facts not in evidence because, during cross examination, the parties are allowed to ask leading questions which are based in fact. Because there was no objection, the basis of the question was not challenged. Thus this review is waived. The presentation of other crimes evidence was addressed in proposition one and found not to constitute plain error. No different result will be reached here.

Williams claims that during first stage closing argument, the prosecutor argued facts no in evidence when he suggested that when Williams was talking to Alvin Jordan about the prior robbery, he was actually planning a future act. There was an objection and the trial court reminded the jury that they would recall what the evidence was. Actually the prosecutor was pointing out that Williams stated he would kill if he had to, which infers a future act.

Williams also claims that the prosecutor's argument indicating that he was the leader of the robbery team was not based on the evidence. There was no objection to this argument. The prosecutor pointed out that Williams robbed the bank before, presented the robbery to the other two, and was the first to shoot. Furthermore, evidence showed that Williams' car was used as the get-away car, and he had control of the firearms used in the robbery before and after the robbery. These "leadership" arguments were reasonably based on the evidence, thus there was no error here. *See Washington v. State,* 1999 OK CR 22, ¶ 42, 989 P.2d 960, 974.

Next, Williams complains, for the first time on appeal, that the prosecutor made claims that the .45-caliber bullet found at the bank indicated that Amber Rogers was caught in a cross fire between Williams and Jordan. Actually, the .45-caliber bullet was not positively matched to Williams' gun, but it might be deduced that no other .45-caliber pistols were fired in the bank besides Williams' pistol. The assertion that Amber Rogers was caught in a cross-fire is not based on the evidence, because the evidence indicated that Rogers was shot as the robbers were leaving the bank. Expert testimony indicated that the .45-caliber bullet's trajectory was from the entry way of the bank.

If the prosecutor's argument was that there were bullets flying during the robbery and Rogers had no protection or defense, then that is probably true. Based

on the entire argument, we cannot say that these comments rose to the level of plain error.

Williams, 188 P.3d at 228-29. In each of these instances, the OCCA found that the prosecutor's arguments were reasonably based on evidence presented at trial. Williams has not demonstrated that these comments by the prosecutor deprived him of a fundamentally fair trial. The OCCA's decision was not an unreasonable application of Supreme Court law, nor was it based on an unreasonable determination of the facts as presented by the evidence. 28 U.S.C. 2254(d)(1), (2). Williams is not entitled to habeas corpus relief on this portion of his ground five claim.

*Comments ridiculed Williams*

Williams next argues that the prosecutor ridiculed him when he asked on cross-examination if Williams was a "self-admitted thief" and a "self-admitted liar." He states that the prosecutors repeatedly told the jury that he was a liar. Further, he complains of the prosecutor's comments during closing argument that "human life meant nothing to Jeremy Williams," and that "Amber Rogers meant nothing to Jeremy Williams." Dkt. # 28 at 190. The OCCA found no error because "any comment about [Williams] not giving truthful information" was based on the evidence, as were the second stage arguments that human life meant nothing to Williams. Williams, 188 P.3d at 229-30. Petitioner has failed to demonstrate how the OCCA's findings were based on an unreasonable application of the facts or were contrary to, or an unreasonable application of, Supreme Court law. He is not entitled to relief on this claim.

*Improper comments to evoke sympathy*

Williams next contends that the prosecutor's comments were improperly designed to elicit sympathy from the jury. Specifically, he complains of the prosecutor's comments urging the jurors

to place themselves in the shoes of the victim, imagine what was going through her mind before she was shot, and focus on the life she was missing out on. Williams claims these arguments were only introduced to evoke the sympathy of jurors. However, he fails to provide Supreme Court law supporting any argument that his constitutional rights were violated by these comments. The OCCA found that the challenged statements made by the prosecutors did not render Williams' trial fundamentally unfair. <u>Williams</u>, 188 P.3d at 230. This Court agrees.

*Personal opinion regarding death penalty*

Williams also complains that the prosecutor improperly argued that the jury would be devaluing the life of Amber Rogers if it did not exact the ultimate punishment from Williams. The OCCA found this statement by the prosecutor "troubling," but not so flagrant that it rendered Williams' trial fundamentally unfair. <u>Id.</u> The OCCA's ruling was not unreasonable. In light of the strong evidence of guilt, evidence of aggravating factors supporting the death penalty, and the content of the instructions to the jury, this Court finds that the prosecutor's comments did not deprive Williams of a fair trial. <u>See</u> <u>e.g.</u>, <u>Malicoat v. Mullin</u>, 426 F.3d 1241, 1257-58 (10th Cir. 2005).

*Improper testimony solicited from witness*

As a final issue of prosecutorial misconduct, Williams contends that the prosecutor elicited improper opinion testimony from Detective Felton when he asked about bruises and abrasions on Williams' body seen shortly after his arrest. In addressing Felton's testimony, the OCCA stated:

> [W]e cannot find that the error in the introduction of this testimony rose to the level of plain error. Felton's opinion was not concrete, or definite. His opinion was more akin to a lay person stating a reasonable conclusion based on the perception of Williams' injuries. Felton stated that the injuries might have been caused by jumping

and falling - and tied his opinion to the theory of escape. The jury was able to observe the photographs and reach its own conclusion. We do not believe that this testimony went to the foundation of the case or took from Williams a right essential to his defense.

Id. at 225. Williams has not convinced this Court that the OCCA's decision was an unreasonable application of Supreme Court law.

Having found no constitutional violations in the alleged instances of prosecutorial misconduct, the Court concludes that Williams is not entitled to habeas corpus relief on his Ground five claims.

## V.     Error in exclusion of potential jurors (ground 6)

In ground six, Williams complains of the trial court's dismissal for cause of potential jurors Stacy Colpitt and Christina Grant. He contends that these venire members were excluded in violation of Witherspoon v. Illinois, 391 U.S. 510 (1968), and his trial counsel should have requested that the judge allow further questioning after they gave initial answers to questions indicating opposition to the death penalty. He further claims his appellate counsel was ineffective for failing to raise the issue on direct appeal. Respondent argues that the issue is unexhausted and subject to an anticipatory procedural bar because Williams never presented a claim to the state court based on a Witherspoon violation - he only presented an ineffective assistance of counsel claim.

Williams' Proposition II, raised in his first application for post-conviction relief, stated: "Trial counsel were ineffective for failing to attempt to rehabilitate potential jurors who expressed doubt at their ability to give a death sentence." See Application for Post-Conviction Relief" in OCCA Case No. PCD-2006-1012 at 8, 26-29. He cited both Witherspoon and Wainwright v. Witt,

469 U.S. 412 (1985), to support his claim that trial counsel did not protect his constitutional rights.

In its order denying relief, the OCCA found as follows:

> In proposition two, Williams claims that counsel was ineffective for failing to attempt to rehabilitate potential jurors who expressed doubt at their ability to give a death sentence. Williams['] claim is not supported by any new information which would have been made available had counsel asked the trial court for permission to try and rehabilitate jurors who doubted their ability to impose a sentence of death. He tries to overcome this deficiency by arguing that this failure amounts to structural error. We disagree. There is no indication that Williams' jury was anything but fair and impartial. His claim here does not amount to structural error. *See Golden v. State*, 2006 OK CR 2, ¶ 15, 127 P.3d 1150, 1153-1154, *citing Arizona v. Fulminante*, 499 U.S. 279, 309-10, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (defining structural error). We find nothing in this claim that indicates counsel acted outside the wide range of reasonable professional conduct.

See Order Denying Petitioner's Original Application for Post-Conviction Relief, filed January 13, 2009, in PCD-2005-1012, at 8. The OCCA went on to conclude "that both trial counsel and appellate counsel were not ineffective for the failures alleged in propositions one[12] and two." Id.

The Court agrees with Respondent that Williams did not present a claim to the OCCA that the trial court's dismissal for cause of venire members Colpitt and Grant was a violation of his constitutional rights. Nor did he argue that his appellate counsel's failure to raise the issue on direct appeal was ineffective assistance. He couched his Proposition II issue on post-conviction as an ineffective assistance of trial counsel claim. However, the OCCA addressed the merits of Williams' complaints about the inability to rehabilitate Colpitt and Grant, and also found that both trial and

---

[12]    In Proposition I, Williams alleged that both trial and appellate counsel were ineffective for failing to adequately investigate, develop and present mitigating evidence on his behalf. He made no argument about the ineffectiveness of appellate counsel in Proposition II.

appellate counsel were not ineffective for the failures alleged in both propositions one and two.[13]

Accordingly, this Court will review the OCCA's adjudication to determine if it "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court law. 28 U.S.C. § 2254(d)(1).

In Witherspoon, the Supreme Court indicated that prospective jurors in a capital case should be excluded if they make it:

> unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's guilt.

Witherspoon, 391 U.S. at 522 n.21. Thereafter, in Adams v. Texas, 448 U.S. 38, 45 (1980), the Court recognized the general proposition that:

> [A] juror may not be challenged for cause based on his views about capital punishment unless those views would prevent or substantially impair the performance of his duties as juror in accordance with his instructions and his oath.

In Wainwright v. Witt, 469 U.S. 412 (1985), the Court indicated a trial judge's factual determination as to a potential juror's bias should be accorded a presumption of correctness pursuant to 28 U.S.C. § 2254(d). Finally, "the question is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." Id. at 434. Since issues of credibility and demeanor are critical to a trial judge's decision regarding removal of a juror, review of such decisions is quite deferential. Castro v. Ward, 138 F.3d 810, 824 (10th Cir. 1998).

---

[13]    It is unclear why the OCCA did not find the ineffective assistance of counsel claim to be procedurally barred. The OCCA decided the issue as if the merits were before it.

In this case, Williams specifically challenges the removal of two jurors for cause claiming that his trial attorney should have requested, and been given, the opportunity to rehabilitate venire members Stacy Colpitt and Christina Grant. He claims their responses to questions about the death penalty suggested that they were indecisive. A review of the trial court record reveals the overall context in which these two potential jurors were removed.

On February 21, 2006, Judge Tom Gillert began the trial proceedings by making general introductions and explanations about voir dire and trial procedure to the fifty-nine persons who had been summoned for possible jury duty in Williams' trial. Tr. Trans. Vol. I at 4-17. He then said, "I'm going to ask you all a series of questions individually beginning in the same order that you were called concerning the law about punishment for first degree murder in the State of Oklahoma and your understanding of that law and your ability to follow that law." Id. at 17. Five persons were questioned about their ability to consider all three punishments (life, life without parole, or death) before Ms. Colpitt. The first three (Ricky Bonebrake, Robert Jacobson, and Mary Hutchens) each stated that they could consider all three punishments if Williams were found guilty. The fourth (Adam Ashing) stated that he would only consider the death penalty if a defendant were found guilty of murder in the first degree. Judge Gillert excused Mr. Ashing. The clerk called another potential juror (Emily Phan), but when it was determined that she did not understand English sufficiently to understand the judge's questions, she was excused. Stacy Colpitt was called next and Judge Gillert began asking her the same questions he had asked the previous potential jurors. His questions and her responses follow:

> JUDGE:    Ms. Colpitt, if the jury finds beyond a reasonable doubt that the defendant is guilty of murder in the first degree, the jury will have the duty to assess punishment. The punishment for murder in the first degree is death,

imprisonment for life without parole, or imprisonment for life. If you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments: Death, imprisonment for life without parole, or imprisonment for life, and impose the one warranted by the law and evidence?

COLPITT: No, I don't think I would consider the death penalty.

JUDGE: Then, ma'am, if you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if the evidence and facts and circumstances in the case, the law would permit you to consider the sentence of death, are your reservations about the death penalty so strong that regardless of the law, the facts, and circumstances in the case, you would not impose the penalty of death?

COLPITT: Yes, I think my reservations are that strong that I could not impose the death penalty.

JUDGE: Regardless of the facts, evidence, circumstances in the case, you could not impose the penalty of death; is that true, ma'am?

COLPITT: I cannot envision a scenario that I could agree with that.

JUDGE: I'll excuse you.

Id. at 23-24. Two days later, on February 23, 2006, Christina Grant was eventually called before Judge Gillert for similar questioning. Their colloquy follows:

JUDGE: Ms. Grant, can you think of any reason that you could not serve as a fair and impartial juror in this case?

GRANT: I think I might have some difficulty with the death penalty.

JUDGE: Well, as you have heard others say, that's not really the question. The question is -- and all have indicated that they would have some difficulty with the death penalty. The question is whether or not depending upon the

|  | facts, circumstances, law, and evidence in the case you could impose that, understanding that to be one of the possible punishments were you to find the defendant guilty of murder in the first degree. |
|---|---|
| GRANT: | I couldn't do that to someone. |
| JUDGE: | So if you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree, and if the evidence, facts, and circumstances in the case and the law would permit you to consider the sentence of death, are your reservations about the penalty of death so strong that regardless of the law, facts, and circumstances of the case you would not impose a penalty of death? |
| GRANT: | Yes. |
| JUDGE: | I'll excuse you. |

Tr. Trans. Vol. II at 376-77. Contrary to Williams' assertions, neither Colpitt nor Grant were indecisive about their position on the death penalty. Each initially expressed reservations about the death penalty. The judge asked each additional questions about their opinions. When asked if their reservations were so strong that regardless of the law, facts, and circumstances of the case they would not impose a penalty of death, each replied that they could not impose the death penalty. Accordingly, this Court finds the two prospective jurors were not improperly questioned and excused. Rather, the Court finds ample support for the trial court's decision that the views of Stacy Colpitt and Christina Grant were so strong that they would not be able to perform their duties as jurors in accordance with the instructions and their oath. See Witt, 469 U.S. at 433 (quoting Adams, 448 U.S. at 45). Thus, these two prospective jurors was properly excused for cause.

Having found that Colpitt and Grant were properly excused for cause, it necessarily follows that trial counsel was not constitutionally ineffective for failing to ask the trial court to allow him

to try to rehabilitate them. Nor was appellate counsel ineffective for failing to raise the issue on direct appeal. Insofar as the OCCA addressed these issues, the state court's decision was not an unreasonable application of Supreme Court law. Williams has not demonstrated that he is entitled to habeas corpus relief on ground six.

## VI.    Trial court errors in failing to exclude certain jurors (ground 7)

Williams next complains that the trial court's rulings during voir dire denied him an impartial jury in violation of the Eighth and Fourteenth Amendments. First, he claims that prospective juror Robert Jacobson should have been excused for cause because he revealed that his mother had been murdered less than a month before Williams' trial. See Dkt. # 28 at 216. He also contends that prospective juror Mary Belcher should have been excused for cause because she stated that she would not be able to remain attentive on certain days dues to her son's upcoming wedding. Id. at 255-56. Williams argues that he was forced to use two peremptory challenges to remove both Mr. Jacobson and Ms. Belcher. Upon review of the merits, the OCCA rejected this claim on direct appeal. Respondent asserts that Williams has failed to establish that the OCCA's determination was contrary to, or an unreasonable application of, Supreme Court law, or that it was an unreasonable determination of the facts.

Under the Sixth Amendment to the Constitution, a defendant has a right to trial by an impartial jury. "One touchstone of a fair trial is an impartial trier of fact - 'a jury capable and willing to decide the case solely on the evidence before it.'" McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 554 (1984) (quoting Smith v. Phillips, 455 U.S. 209, 217 (1982)). The proper standard for determining when a prospective juror should be excused for cause is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with

his instructions and his oath." <u>Witt</u>, 469 U.S. at 424 (1985) (quoting <u>Adams</u>, 448 U.S. 38). On direct appeal, the OCCA rejected Williams' claim, citing two Oklahoma cases, which in turn reiterated the standard set forth in <u>Witt</u>.

Any claim that Williams' jury was not impartial must focus on the jurors who ultimately sat, and not the jurors who were excused through peremptory challenges because the judge would not excuse them. <u>Ross v. Oklahoma</u>, 487 U.S. 81, 85-86 (1988); <u>see</u> <u>also</u> <u>United States v. Martinez-Salazar</u>, 528 U.S. 304, 305 (2000) (citing <u>Ross</u> and noting that "[s]o long as the jury that sits is impartial, . . . , the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated").

Without providing any detailed information about the two jurors he was forced to accept after using peremptory challenges on Robert Jacobson and Mary Belcher, Williams simply generalizes that, "The two peremptory challenges squandered as a result of the trial court's error would have otherwise been used to remove two additional jurors who expressed little or no trepidation at imposing the death penalty on Mr. Williams." Dkt. # 46 at 121. Significantly, nothing in the record or in the pleadings supports a necessary component to establish a constitutional violation - that the additional jurors who remained to sit on the jury were not impartial. The Court agrees with the OCCA that no violation of Williams' right to an impartial jury occurred at his trial. Habeas relief shall be denied on this issue.

## VII.     Victim impact evidence (ground 8)

Williams' eighth ground for habeas corpus relief consists of a twofold argument relating to victim impact evidence. First, he asserts that the victim impact evidence allowed at his trial exceeded constitutionally permitted bounds. Second, he claims that his constitutional rights were violated

because the jury was not instructed about proper use of victim impact evidence. These claims were raised on direct appeal and rejected by the OCCA. Williams, 188 P.3d at 226-27. Respondent contends that the OCCA's ruling was not an unreasonable application of clearly established Supreme Court law.

*Improper victim impact evidence*

Williams first argues that much of the victim impact evidence introduced at his trial was unconstitutionally improper under the parameters established in Payne v. Tennessee, 501 U.S. 808 (1991). At the end of the State's case in the second stage proceedings, the victim's husband, Bryan Rogers, her sister, Brecka Bagby, and her mother, Deborah Mizell, each testified as victim impact witnesses. See Tr. Trans. Vol. VIII at 1767-77. During his testimony, Bryan Rogers described the relationship he had with his wife and the pain he suffered after her murder. Id. at 1767-71. Likewise, Brecka Bagby, described the close relationship she had with her sister and how she was emotionally affected by the murder. Id. at 1771-73. Deborah Mizell explained how the death of her youngest daughter affected her and other members of the family. Id. at 1774-77. Williams asserts that their testimony was unfairly prejudicial and exceeded constitutional limitations.

The OCCA denied relief on this issue, finding as follows:

> The victim impact evidence in this case came through three different witnesses, Amber Rogers' husband, sister and mother: Bryan Rogers, Brecka Bagby and Deborah Mizell. Williams' complaint is that the witnesses were allowed, over objection, to testify about the impact of the death on other family members. Each witness read prepared written statements which were examined by trial counsel and objections were lodged to certain portions of the statements.

> This Court has stated that both "victim impact statements" and "victim impact evidence" are admissible in a capital sentencing procedure. This includes a victim's rendition of the "circumstances surrounding the crime, the manner in which

the crime was perpetrated, and the victim's opinion of a recommended sentence." *Dodd v. State*, 2004 OK CR 31, ¶ 95, 100 P.3d 1017, 1044; see 22 O.S.2001, § 984. Section 984 reads in part:

> "Victim impact statements" means information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence. . . .

However, evidence may be introduced that "is so unduly prejudicial that it renders the trial fundamentally unfair" thus implicating the Due Process Clause of the Fourteenth Amendment. *Lott,* 2004 OK CR 27, ¶ 109, 98 P.3d at 346, *quoting Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).

The issue here is whether an immediate family member can both testify on their behalf and represent other members of the immediate family. "Members of the immediate family" means the spouse, a child by birth or adoption, a stepchild, a parent, or a sibling of each victim. 22 O.S.2001, § 984.

In *Lott*, two members of the immediate family testified—the victim's son and daughter. Another witness also testified—the victim's granddaughter who was a "representative." She testified about the impact of the death on the entire family (even though she was not a member of the "immediate family"), her father and her aunts and uncles. (Her father and one of her aunts were the two witnesses who also presented victim impact evidence).

In *Hooks v. State*, 2001 OK CR 1, ¶ 37, 19 P.3d 294, 313, this Court held that a family member can give victim impact testimony on behalf of several immediate family members, as long as that testimony is otherwise admissible. Here Deborah Mizell testified about the impact on her granddaughters, who were the victim's nieces. She stated that Amber's family and friends have suffered greatly since Amber's death. Bryan Rogers stated that Amber took a job at a Mental Health Facility and made a difference in so many people's lives. Brecka Bagby stated that her two twin daughters idolized Amber. Counsel objected to these statements as well as statements concerning discussions with Amber over her fear after the first robbery.

> While some of the people mentioned in these statements were not immediate family members, portions of the statements can be read to show how the immediate family members' interaction with others outside the immediate family was impacted by the death. The remainder of the statements gives a brief glimpse into the life of Amber Rogers and the circumstances surrounding the crime, which included her fear of a second robbery. All of this is clearly admissible. There is no error in the victim impact evidence in this case.

Williams, 188 P.3d at 227.

If a state chooses to allow the admission of victim impact evidence, the Eighth Amendment erects no per se bar. "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." Payne v. Tennessee, 501 U.S. 808, 827 (1991). In overruling its own previous split decisions in Booth v. Maryland, 482 U.S. 496 (1987), and South Carolina v. Gathers, 490 U.S. 805 (1989), the Supreme Court observed that "assessment of the harm caused by the defendant has long been an important factor in determining the appropriate punishment, and victim impact evidence is simply another method of informing the sentencing authority about such harm." Payne, 501 U.S. at 808. Noting that in most cases, "victim impact evidence serves entirely legitimate purposes," the Payne Court concluded that such statements are "evidence of a general type long considered by the sentencing authorities." Id. at 825. Although not constitutionally barred, victim impact statements remain subject to certain restrictions and limitations. Victim impact evidence cannot be "so unduly prejudicial that it renders the trial fundamentally unfair" in violation of the Due Process Clause of the Fourteenth Amendment. Short v. Sirmons, 472 F.3d 1177, 1192 (10th Cir. 2006) (quoting Turrentine v. Mullin, 390 F.3d 1181,

1200 (10th Cir. 2004)). In 1992, Oklahoma enacted legislation permitting victim impact evidence. <u>See</u> Okla. Stat. tit. 21, § 701.10© (1992),[14] and Okla. Stat tit. 22, §§ 984, 984.1 (1992).[15]

The OCCA found the statements of the husband, sister and mother were within the parameters allowed under the law. <u>Williams</u>, 188 P.3d at 227. Williams has failed to demonstrate how the OCCA's decision was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Federal habeas corpus review of the admission of victim impact evidence is limited to a determination whether the use of the victim statement made the sentencing hearing "so fundamentally unfair as to deny him due process." <u>Donnelly</u>, 416 U.S. at 645; *accord*, <u>Payne</u>, 501 U.S. at 825. In reviewing the victim impact statements made by these three witnesses, this Court finds that the remarks did not so infect the sentencing proceeding as to render it fundamentally unfair. Accordingly, habeas relief is denied on this issue.

*Failure to instruct the jury on use of victim impact evidence*

Williams' allegation that the trial court erred in failing to instruct the jury regarding the proper use of victim impact evidence was also raised on direct appeal. He claims the omission of an instruction on the use of victim impact evidence violated his rights under the Eighth and Fourteenth Amendments. The OCCA rejected this argument, finding:

---

[14]     Section 701.10© of Title 21 provides, "[i]n the sentencing proceeding, . . . the state may introduce evidence about the victim and about the impact of the murder on the family of the victim."

[15]     Section 984 of Title 22, in effect at the time of Williams' crime, defines "victim impact statements" as "information about the financial, emotional, psychological, and physical effects of a violent crime on each victim and members of their immediate family, or person designated by the victim or by family members of the victim and includes information about the victim, circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion of a recommended sentence."

> Addressing the failure to give the uniform jury instruction on victim impact evidence, OUJI-CR 2d 9-45 (1996), we held that the failure to give this instruction is not always fatal. *See Powell*, 2000 OK CR 5, ¶ 121, 995 P.2d at 535; *Thornburg v. State*, 1999 OK CR 32, ¶ 34, 985 P.2d 1234, 1246. Other than his argument that the victim impact testimony exceeded the scope of admissible victim impact evidence, Williams has not shown how the lack of an instruction caused him to receive a sentence not supported by the evidence. *Id.* The victim impact evidence was proper and was not fraught with the type of emotional content that would cause the jury to totally ignore mitigating evidence. Failure to give the instruction was not so serious as to deprive Williams of a fair trial, with a result that was reliable.

Williams, 188 P.3d at 226-27. Williams argues that, without the benefit of an instruction the jury had no meaningful guidance as to the proper use of victim impact statements and was given the "unbridled ability to factor these statements into its sentencing decision in any manner it saw fit in violation of the Eighth and Fourteenth Amendments." Dkt. # 28 at 234. These arguments are mere speculation and are not supported by the record.

The Court is not convinced that the trial court's failure to expressly give such an instruction is constitutional error. Williams' jury was fully instructed as to its duties for determining punishment in the second stage proceedings. In arriving at a determination of punishment the jury was instructed to first determine whether any one or more of the three aggravating circumstances existed beyond a reasonable doubt. (Instruction No. 7, O.R. Vol. VII at 1077). Jurors were advised they could "consider only those aggravating circumstances set forth in these instructions." (Instruction No. 10, O.R. Vol. VII at 1080). Only after unanimously finding that one or more of the aggravating circumstances existed beyond a reasonable doubt could the jury even consider imposing a death sentence. Id. The jury was also instructed about mitigating evidence and the weighing process to be given to aggravating circumstances and mitigating evidence. (Instruction Nos. 13, 14, 15, O.R. Vol. VII at 1085-87). The jury is presumed to follow its instructions. Weeks v. Angelone, 528 U.S. 225,

234 (2000) (citing <u>Richardson v. Marsh</u>, 481 U.S. 200 (1987)). Williams' assumption that his jury may have considered the victim impact evidence improperly in its decision to recommend a death sentence ignores the plain language of the second stage instructions given at trial, which the jury is presumed to follow.

Finally, the Supreme Court has determined that aggravating circumstances give effect to constitutional protections by narrowing the class of death eligible murders, and the introduction of victim impact evidence does not eliminate that effect. <u>Tuilaepa v. California</u>, 512 U.S. 967, 979-80 (1994). "[T]he sentencer may be given unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty." <u>Id.</u> (internal quotations omitted). "A capital sentencer need not be instructed how to weigh any particular fact in the capital sentencing decision." <u>Id.</u> at 979. This Court finds that the absence of a jury instruction regarding the purpose and use of victim impact evidence did not deprive Williams of his Eighth Amendment or Fourteenth Amendment rights. The OCCA's decision on this issue in Williams' direct appeal was not an unreasonable application of clearly established federal law as determined by the Supreme Court. Habeas relief shall be denied on this issue.

## VIII.   Prejudicial and irrelevant evidence (ground 9)

In his ninth ground for relief, Williams asserts that the admission of certain evidence violated his rights under the Due Process Clause. More specifically, he challenges the admission of a target silhouette, photographs of his girlfriend's apartment, nude photographs of the victim, testimony of treating physicians, audio tapes of 911 calls, and the testimony of a co-worker regarding her conversation with the victim on the morning of the murder. These claims were presented to the

OCCA on direct appeal and rejected. Respondent states that evidentiary claims are not cognizable in habeas corpus proceedings unless the challenged evidence rendered Williams' case fundamentally unfair.

Evidentiary rulings cannot serve as the basis for habeas corpus relief unless the ruling rendered Williams' trial fundamentally unfair resulting in a violation of due process. Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002). Consequently, Williams must demonstrate that the OCCA's rejection of this claim was an unreasonable application of Supreme Court law, and that the admission of the physical evidence and testimony in question rendered his trial fundamentally unfair.

*Target silhouette*

Williams contends that the admission of State's Ex. 184, a target silhouette that Williams had placed on the bedroom wall of the condominium he shared at one time with Dyra Malone, was irrelevant and prejudicial because its sole purpose was to cast a negative image of Williams and those with whom he associated. Dyra Malone testified that Williams brought it to her apartment, hung it on the wall, and told her he had shot at the silhouette while at the shooting range. Tr. Trans. Vol. V at 1010-11. The OCCA found that the silhouette was relevant to show that Williams "was competent with firearms; that he was prepared to use firearms; and that he was familiar with the concept of shooting at the center mass of a target to maximize the lethal effect." Williams, 188 P.3d at 223. This Court agrees and finds that admission of the target silhouette did not render Williams' trial fundamentally unfair.

*Pictures of Tarina Clark's apartment*

He next contends that the admission of photographs of the clutter in Tarina Clark's apartment was irrelevant and introduced to cast a negative image of Williams and his friends. Finding no prejudice to Williams, and no plain error, the OCCA determined that the photographs were relevant to understand Tarina Clark's testimony. Id. Williams has failed to convince this Court that the admission of the photographs rendered his trial fundamentally unfair.

*Nude photos of victim*

The State introduced two photographs of the victim's nude body taken by the medical examiner during the autopsy procedure. Tr. Trans. Vol. VI at 1494. Williams argues that the photographs were unnecessarily entered into evidence because other evidence and testimony showed the nature and extent of the victim's fatal wounds and established that she had died. The OCCA rejected this claim, finding as follows:

> These photographs show the entry and exit of the gunshot wound sustained by the victim. The photographs show the handiwork of the defendant. And while one of the photographs does show surgical sutures, these photographs are relevant because they more closely depict the nature and extent of the gunshot wound on the victim's body than any other evidence available, including the medical examiner's depiction of the wound locations on a chart.

Williams, 188 P.3d at 223. The Court agrees that the autopsy photographs were relevant and painted a clearer picture of the fatal injuries suffered by Amber Rogers. The Court concludes that the admission the photographs did not render Williams' trial fundamentally unfair. See Wilson v. Sirmons, 536 F.3d 1064, 1115 (10th Cir. 2008).

*911 audio tapes*

Williams next argues that the admission of an audio tape of the 911 calls made during the robbery was error because it was irrelevant and designed to inflame the jury for emotional reasons. Declining to grant relief on direct appeal, the OCCA stated:

> The tape contains a call from Donnie Cox to the 9-1-1 operator; a call from the alarm company to the 9-1-1 operator; a call from another woman in the building (Irma Hickman) to the 9-1-1 operator reporting gun shots and screaming; a call from Shelly Martin to 9-1-1 "been robbed and three people are shot;" and a call from Sandra Simmons to 9-1-1 reporting the white car speeding through the parking lot just before the police arrived: "small white older sports car -- beat up -- dark windows."
>
> Most of these calls are occurring soon after the offense and can be described as so close to the event to be excited utterances and possibly even present sense impressions. While these tapes might have been cumulative to the witnesses' testimony, the cumulative effect did not substantially outweigh the relevance contained therein. The introduction of this tape did not rise to the level of plain error.

Williams, 188 P.3d at 223. The Court fails to see how the admission of the 911 tape rendered the proceedings fundamentally unfair. Williams has not demonstrated entitlement to habeas relief on this claim.

### Christina Tull's testimony

Williams asserts that witness Christina Tull's testimony regarding a conversation she had with the victim shortly before the robbery was introduced solely to evoke an emotional response from the jury. The OCCA agreed that "the introduction of this conversation constituted error because it was not relevant." Id. However, the OCCA also concluded that Williams did not show how he was prejudiced by the introduction of this conversation. This Court agrees that the testimony was irrelevant, but also agrees that the admission of the testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." See Wilson, 536 F.3d at 1116

(quoting <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)). The Court cannot conclude that the error rendered Williams' trial fundamentally unfair.

*Testimony of treating physicians*

Williams first complains that the testimony of the physician who treated Amber Rogers, trying to save her life, was prejudicial and designed to invoke sympathy from the jury. He also argues that the "graphic testimony" in second stage proceedings from the surgeons who treated Howard Smith and Mark Poole was introduced only to inflame the passions of the jury. The OCCA rejected these claims on direct appeal finding as follows:

> Williams' next complaint regards testimony of the surgeons who treated the victims. He first complains that testimony from the surgeon responsible for the treatment of Amber Rogers was not relevant during the first stage of trial. Williams argues that Dr. Curtis Yeary's testimony should have been limited to the fact that, despite his efforts, Amber Rogers died while being treated, instead of the "step by step" detail of the treatment of Rogers in an effort to save her life.

> Williams failed to utter any objections to this line of testimony, thus he must show that the testimony constituted plain error. The State is obligated to show that the death was caused by the criminal actions of the defendant. In order to show that, in this case, the State had to show that Amber Rogers died despite the heroic efforts of the surgery team. There was no plain error here.

> Williams also complains about the second stage testimony of the surgeons that treated the other victims who did not die. Again, there was no objection to this testimony, thus we review for plain error only. 12 O.S.2001, § 2104. Here, one of the aggravating circumstances alleged was that Williams created a great risk of death to more than one person. Although, Williams claims that evidence that these two victims were shot was sufficient to show a great risk of death to more than one person, our cases reveal that testimony about the nature and extent of gunshot wounds are relevant for this aggravating circumstance. *See Selsor v. State*, 2000 OK CR 9, ¶ 25, 2 P.3d 344, 352. Therefore, the introduction of this testimony did not go to the foundation of the case or take from Williams a right essential to his defense. 12 O.S.2001, § 2104; *Andrew v. State*, 2007 OK CR 23, ¶ 24, 164 P.3d 176, 188.

Williams, 188 P.3d at 224. Williams has failed to establish that the testimony of any of the attending physicians rendered his trial so fundamentally unfair that he was denied his constitutional rights.

Because Williams has not demonstrated that the OCCA's resolution of his ground nine claims was an unreasonable determination of Supreme Court law, he is not entitled to habeas corpus relief on ground nine.

## IX. Jury instruction (ground 10)

In his tenth ground, Williams claims theat the jury instructions regarding mitigation evidence precluded the jury from considering all mitigation evidence. More specifically, Williams asserts that second stage jury instruction number thirteen "impermissibly narrows the characterization of mitigation to exclude evidence about the accused that may warrant a sentence less that death." Dkt. # 28 at 244. The instruction, in its entirety, states as follows:

> Mitigating circumstances are those which, in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.

> While all twelve jurors must unanimously agree that the State has established beyond a reasonable doubt the existence of at least one aggravating circumstance prior to consideration of the death penalty, unanimous agreement of jurors concerning mitigating circumstances is not required. In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them.

O.R. Vol. VI at 1085. The OCCA denied relief on this claim in Williams' direct appeal. Respondent asserts that the OCCA's decision was not an unreasonable application of Supreme Court law.

In rejecting this claim, the OCCA found as follows:

> In proposition ten, Williams claims that the instructions defining mitigating evidence were insufficient. He argues that the trial court's instruction which defines

mitigating evidence as factors which "in fairness, sympathy, and mercy, may extenuate or reduce the degree of moral culpability or blame" impermissibly narrows the characterization of mitigation. He claims this definition excludes evidence about a defendant that may warrant a sentence less than death, because the evidence may not lessen his moral culpability or blame. The trial court rejected trial counsel's requested instructions.

The trial court gave the Oklahoma Uniform Jury Instruction OUJI-CR 2d 4-78 (1996) over objection by trial counsel. The trial court also gave OUJI-CR 2d 4-79 (1996), which included a list of mitigating evidence and additional instructions which allowed the jury to consider other mitigating circumstances, if found to exist. This Court has previously analyzed these instructions and determined that they are appropriate. *Rojem*, 2006 OK CR 7, ¶¶ 57-58, 130 P.3d at 299. This Court will not revisit the issue here.

Williams, 188 P.3d at 227-28. Williams claims that the Rojem decision was focused on the lack of a weighing instruction, rather than conflicting instructions which he argues were presented to his jury.

The Tenth Circuit has previously rejected challenges to the same instruction which Williams challenges, and confirmed that it does not present an unconstitutional dilemma for a jury. In Smallwood v. Gibson, 191 F.3d 1257 (10th Cir.1999), the Circuit stated:

Petitioner also claims that the jury instructions given by the district court were unconstitutional because they permitted the jury to ignore mitigating evidence. The challenged jury instruction states:

Mitigating circumstances are those which, in fairness and mercy, may be considered as extenuating or reducing the degree of moral culpability or blame. The determination of what are mitigating circumstances is for you as jurors to resolve under the facts and circumstances of this case.

Second Stage Jury Instruction No. 8, R., Vol. III at 597. We rejected petitioner's argument with respect to virtually identical instructions in *Boyd v. Ward*, 179 F.3d 904, 924 (10th Cir.1999) ("The use of the word 'may' does not alone compel the

> conclusion that the jury was empowered to ignore mitigating evidence. . . . There is
> no reasonable likelihood that the jury applied the instructions in such a way that it was
> prevented from considering mitigating evidence."). Consequently, petitioner is not
> entitled to relief on this claim.

Smallwood, 191 F.3d at 1271. As did the petitioner in Smallwood, Williams claims the instruction

defined mitigating circumstances in a way which could lead the jury to consider only certain

mitigating evidence. The Court disagrees. Contrary to Williams' argument, the Court finds that there

is no reasonable likelihood that the jury applied the instructions in such a way that it was prevented

from considering mitigating evidence. Boyde v. California, 494 U.S. 370, 380 (1990) (finding that

the standard is not whether an instruction is ambiguous and subject to an erroneous interpretation,

but "whether there is a reasonable likelihood that the jury has applied the challenged instruction in

a way that prevents the consideration of constitutionally relevant evidence"). The OCCA's resolution

of this issue was not contrary to, or an unreasonable application of, Supreme Court law. Habeas relief

shall be denied on Williams' ground ten claim.

## X.     Continuing threat aggravator (ground 11)

Williams next challenges the constitutionality of the continuing threat aggravating

circumstance as defined and applied in the State of Oklahoma. He argues that this aggravating

circumstance fails to narrow the class of convicted murderers eligible for the death penalty. Raised

on direct appeal, this issue was rejected by the OCCA, which found:

> Williams recognizes that we have consistently rejected this claim, but urges this
> Court to reconsider our position. Williams has cited no new case law which would

cause this Court to reconsider our previous holdings. Therefore, this proposition must fail.

Williams, 188 P.3d at 228.

Tenth Circuit precedent forecloses Williams' challenge to Oklahoma's continuing threat aggravator as unconstitutional. Wilson, 536 F.3d at 1109; Sallahdin v. Gibson, 275 F.3d 1211, 1232 (10th Cir. 2002); Medlock, 200 F.3d at 1319 (noting that the Tenth Circuit has repeatedly upheld the facial constitutionality of the continuing threat aggravator as narrowed by the State of Oklahoma); Nguyen v. Reynolds, 131 F.3d 1349, 1352-353 (10th Cir. 1997). Petitioner makes no argument which compels or permits this Court to disregard the binding precedent. Accordingly, habeas relief must be denied on this issue.

## XI.     Cumulative errors (grounds 12 and 13)

Williams claims in ground twelve that the aggregate prejudice of any two or more instances of ineffective assistance of counsel combined to justify habeas relief. His list of "numerous acts of ineffective assistance" of trial and direct-appellate counsel include: (1) failure to conduct a reasonable investigation into Mr. Williams' background and history for mitigation purposes; (2) failures to object to numerous pieces of damaging and unfairly prejudicial evidence; (3) failure to raise numerous meritorious issues both at trial and during direct appeal; and (4) constructive absence from trial. See Dkt. # 28 at 251. Williams raised claims of cumulative error both on direct appeal and in his first application for post-conviction relief. The OCCA denied relief in both instances. The Tenth Circuit Court of Appeals has specifically held that cumulative error analysis is applicable "only where there are two or more actual errors." Fero v. Kerby, 39 F.3d 1462, 1475 (10th Cir. 1994) (citing United States v. Rivera, 900 F.2d 1462, 1571 (10th Cir. 1990)). Cumulative impact of

non-errors is not part of the analysis. Id. Having rejected each of Williams' ineffective assistance of counsel claims, the Court finds he has shown no cumulative error warranting a new trial.

In ground thirteen, Williams seeks relief based on the cumulative effect of errors arising from the admission of multiple pieces of inadmissible evidence and multiple acts of prosecutorial misconduct. Cumulative error analysis "merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Hamilton v. Mullin, 436 F.3d 1181, 1196 (10th Cir. 2006) (quoting Workman v. Mullin, 342 F.3d 1100, 1116 (10th Cir. 2003)). This Court has reviewed the identified trial errors together to determine if the accumulation rendered Williams' trial unfair. The Court cannot find under the facts of this case that the cumulative effect of the errors had a "substantial and injurious effect or influence in determining the jury's verdict." Fry v. Pliler, 551 U.S. 112, 121 (2007); Brecht, 507 U.S. at 637. The Court finds Williams has shown no cumulative error warranting a new trial. The OCCA's denial of Williams' claims based on cumulative error was not an unreasonable application of Supreme Court law. He is not entitled to relief on either ground twelve or ground thirteen.

## XII.    Evidentiary hearing

In his petition (Dkt. # 28 at 83), Williams seeks an evidentiary hearing "on every claim for which additional fact development may be necessary." As the disposition of Williams' habeas corpus petition does not require reference to any materials beyond those that are available and currently before the Court, this Court finds that there is no need for an evidentiary hearing in this case. There are no disputed factual questions remaining that could possibly entitle Williams to

habeas corpus relief. He has failed to demonstrate the need for an evidentiary hearing under either 28 U.S.C. § 2254(e)(2), or any other governing principle of law. Williams v. Taylor, 529 U.S. 420 (2000). Accordingly, Williams' request for an evidentiary hearing is denied.

## CERTIFICATE OF APPEALABILITY

Rule 11, Rules Governing Section 2254 Cases in the United States District Courts, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." The Court recognizes that "review of a death sentence is among the most serious examinations any court of law ever undertakes." Brecheen, 41 F.3d at 1370. To be granted a certificate of appealability, however, Williams must demonstrate a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner can satisfy that standard by demonstrating that the issues raised are debatable among jurists of reason or that the questions deserve further proceedings. Miller-El v. Cockrell, 537 U.S. 322, 327 (2003). "Obviously the petitioner need not show that he should prevail on the merits. He has already failed in that endeavor." Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983) (citations omitted).

The Court reviewed each of Williams' propositions of error, and found none of the claims merited or warranted habeas relief. However, the Court recognizes that some of Williams' stated issues relate to the alleged deprivation of one of his constitutional rights, which, if substantiated, could entitle him to habeas relief. In order to ensure that these issues receive the type of review on appeal which should be accorded such serious matters, the Court has carefully considered each issue and finds that the following enumerated issues could be debated among jurists or could be resolved differently by another court:

Grounds One and Four: ineffective assistance of counsel

72

Additionally, this Court finds that these same issues are adequate to deserve encouragement to proceed further. See Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot, 463 U.S. at 893).

## CONCLUSION

After careful review of the record in this case, the Court concludes that Jeremy Williams has not established that he is in custody in violation of the Constitution or laws of the United States. His petition for writ of habeas corpus shall be denied.

**ACCORDINGLY IT IS HEREBY ORDERED** that:

1.    The petition for writ of habeas corpus (Dkt. # 28) is **denied**.

2.    A certificate of appealability is granted as to the claims enumerated herein.

3.    A separate judgment shall be entered in this matter.

**DATED** this 19th day of October 2012.

James H. Payne
United States District Judge
Northern District of Oklahoma